**UNITED STATES of America,**
**Appellee,**

v.

**Joseph MICCICHE, Sr., et**
**al., Appellants.**

**Nos. 75–1220, 75–1221, 75–1223, 75–1224.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 9, 1975.

Decided Oct. 30, 1975.

---

O. W. Pete Wiggins, Sr., Little Rock, Ark., for Micciche and Jarnigan.

H. Allan Dishongh, Little Rock, Ark., for Ward and Slingerland.

John Forster, Asst. U.S. Atty., and Sam Perrone, Asst. U.S. Atty., Little Rock, Ark., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, and BRIGHT and ROSS, Circuit Judges.

PER CURIAM.

The four appellants challenge their conviction by a jury of conspiring to knowingly and fraudulently transfer and conceal assets in contemplation of a bankruptcy proceeding and with intent to defeat the bankruptcy law. 18 U.S.C. § 152. The sole issue raised is sufficiency of the evidence. We affirm the convictions of appellants Frank Douglas Ward

and Johnnie Slingerland, but reverse those of Paul Jarnigan and Joseph Micciche, Sr.

■ There was clearly sufficient evidence to support the convictions of Ward and Slingerland. Government witness-William Wilson testified that he, Ward, and Slingerland expressly agreed to conduct a scheme to defraud creditors which he termed a "scam." The basic idea of the "scam" was to establish good credit, order a large inventory, dispose of that inventory for whatever it would bring, and then disappear.

This scheme was carried out essentially as planned. A furniture store was established in December of 1973, under the name of Factory Surplus and Freight Sales (FSFS). Several branch stores were also established. FSFS did a rapidly increasing business in inexpensive furniture sold at very low prices. In April of 1974, a huge inventory began to arrive. Also, in mid-April, the company that had been financing many of FSFS' credit sales severely curtailed the amount of recourse paper it would accept.

Much of this inventory was stored in various places rented on a short-term basis. This inventory was then trucked to auction houses throughout the South and sold at prices substantially below wholesale. Many trucks were rented for this purpose. Wilson testified that one truck was purchased and that title was placed in Ward to conceal it from any bankruptcy proceedings.

By April 30, 1974, the FSFS store was completely emptied of furniture. On that day defendant-Slingerland, the nominal proprietor of FSFS, reported to city police that he had been robbed of $68,000 in cash. Some time prior to this alleged robbery, witness-Wilson told another witness that such a robbery would be claimed in order to account for the missing assets of FSFS. Although defendant-Slingerland reported the robbery to the police, he never provided a statement of the circumstances to them as requested. He explained at trial that this was because he did not care for the attitude of the police. The record indicates that the police seemed skeptical of his robbery report.

A petition of creditors for involuntary bankruptcy was filed against Wilson, Slingerland, and FSFS on May 10, 1974, and a receiver was appointed. On June 27, 1974, an injunction was issued against defendants-Ward, Micciche, and Jarnigan forbidding them to dispose of any assets of FSFS. It is not clear when, if ever, the various defendants learned of these proceedings prior to the time criminal charges were brought against them.[1]

■ With respect to Ward and Slingerland, the testimony of witness-Wilson precludes any innocent interpretation of these facts. While it is true that Wilson's character was shown to be less that spotless, it is well settled that "a conviction can rest on the uncorroborated testimony of a codefendant or accomplice." *United States v. Guy,* 456 F.2d 1157, 1161 (8th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 136, 34 L.Ed.2d 153 (1972); *Wood v. United States,* 361 F.2d 802 (8th Cir. 1966). Further, Wilson's testimony was substantially corroborated. For example, the record shows that Wilson knew that Slingerland was planning a phony robbery some time prior to its occurrence. Other evidence in the record also serves to corroborate this direct testimony of an express conspiracy intended to defraud creditors and frustrate the bankruptcy laws.

The situation is quite different with respect to defendants-Jarnigan and Micciche. They were salesmen working for FSFS. Jarnigan also managed a branch of FSFS for a short time. Both were apparently extremely effective and successful as salesmen.

Although the Government concedes that Jarnigan and Micciche were nor a part of the original conspiracy, it contends that they later joined the conspir-

---

1. Slingerland admitted that he knew of the bankruptcy proceedings prior to his last attempt to auction FSFS furniture.

acy. There is no direct evidence of this. Indeed, the Government witness, Wilson, testified that Jarnigan and Micciche were not involved in the scheme in any manner.

■ The Government relies upon four major pieces of evidence to implicate Jarnigan in the conspiracy. First, Jarnigan did buy a quantity of furniture from FSFS at a bargain price. However, Government witness-Wilson testified that this was a bona fide sale. He said that Jarnigan agreed to pay a substantial price and put down $900 in cash. Defendant-Slingerland also testified that this was an arm's length sale and that others had made similar purchases at a similar price. Further, the record contains a written receipt given to Jarnigan acknowledging the $900 payment. It is true that at one point, in talking to a policeman, Jarnigan did indicate that Slingerland would receive some of the profits of the sale of that furniture. However, this testimony is equivocal at best, since there was a substantial balance still owing to Slingerland.[2]

Second, Jarnigan was shown to have received a check for $465 that originated as proceeds from one of the auction sales. However, the record reveals from disinterested testimony that this check had been delivered in blank to witness-Wilson, and Jarnigan's name and endorsement on the check were in a different ink. Wilson testified that this check represented a loan to Jarnigan.

Third, there is some evidence that Jarnigan admitted taking advantage of the confusion surrounding the collapse of FSFS to "steal" some furniture for his own purposes. The record, however, is unclear as to whether "steal" was Jarnigan's term or whether that was the conclusion of the witness. In any event, the fact that Jarnigan may have stolen furniture from FSFS does not show that he was a part of the general conspiracy, but rather indicates that he was working for his own purposes. Such a theft, if prov-

en, would be a serious offense, but it is not the single conspiracy charged by this indictment.

Finally, the record shows that Jarnigan participated in taking FSFS furniture to various temporary storage places and from there to auctions. However, this, too, does not show knowledge of the scheme to disappear with the fruits of the auction thereby defrauding the creditors.

■ The case against Micciche is even weaker than that against Jarnigan. Basically, all that is shown is that Micciche participated in renting temporary storage facilities for the furniture and in transporting it to auctions. There was also some evidence that Micciche purchased several cashier's checks for several thousand dollars during this period. However, the Government never tied the purchase of those cashier's checks to the conspiracy itself.

It may be that Jarnigan and Micciche knew of the conspiracy. However, the indictment under which they were tried charges a knowing and intentional plan to conceal assets in contemplation of bankruptcy or to fraudulently transfer assets with the intent to defeat the bankruptcy laws. There is no evidence in this record from which a jury could find beyond a reasonable doubt that Jarnigan or Micciche knowingly and intentionally entered the conspiracy with the specific intent to defeat bankruptcy proceedings. The thrust of the evidence against these two might apply to any major employee of a distressed business. The rest, viewed cumulatively, is no more than suspicious and does not establish the essentials of an agreement with the principals to accomplish the unlawful objects as charged in the indictment which is necessary to sustain the conspiracy charge.

Accordingly, Nos. 75–1223 and 75–1224 are affirmed; Nos. 75–1220 and 75–1221 are reversed.

---

2. The evidence that Jarnigan purchased a 41-acre farm was never related to the conspiracy. In view of the many commercial storage places used by the conspiracy, the inference, sought to be drawn by the prosecution, that the desire to conceal furniture motivated Jarnigan's purchase of the tract, rests upon mere conjecture.