NEWMAN, Circuit Judge:
 

 Eugene Guiliano appeals from a judgment of the District Court for the Eastern District of New York (George C. Pratt, Judge) convicting him, after a jury trial, of aiding and abetting in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) (the RICO Act) (Count 1), and in the concealment from a bankruptcy trustee of property belonging to the estate of a bankrupt in violation of 18 U.S.C. § 152 (Counts 3 and 4).
 
 [1]
 
 Appellant challenges primarily the sufficiency of the evidence. We reverse the judgment and order a retrial on one of the bankruptcy fraud counts (Count 3).
 

 Guiliano and a co-defendant, Frank P. Spinale, were indicted for racketeering and bankruptcy fraud as a result of the bankruptcies of two corporations, Archie’s Acres, Inc. and Vantage Produce Sales, Inc. Archie’s Acres was a produce retailer owned and operated by Spinale. The company opened its first store in November 1974. At the peak of its business, the store sold $45,-000 of produce, dairy, and delicatessen items each week, but the sales did not keep pace with the company’s purchases. To provide another outlet for the inventory, the company opened a second store in the fall of 1975. Less than three months later, this store sustained a serious fire loss, which proved to be the undoing of the business. A bankruptcy petition was filed on behalf of the company in February 1976, the com
 
 *87
 
 pany was adjudicated a bankrupt on March 5, 1976, and a trustee was appointed on March 31.
 

 Vantage was a produce wholesaler formed in February 1976 by Frank Petro-celli, its president, purchasing agent, and sole stockholder. Petroeelli hired Spinale to work as the company’s sales manager, and Spinale brought in Guiliano to work as a salesman. Like Archie’s Acres, Vantage consistently bought more produce than it was able to sell. A bankruptcy petition filed on behalf of the company in August 1976 resulted in an adjudication of bankruptcy and the appointment of a trustee two months later.
 

 The Government’s theory was that the defendants had used Archie’s Acres, Vantage, and four other corporations owned or operated by Spinale to generate cash for themselves, thereby causing the collapse of Archie’s Acres and Vantage. Count 1 of the indictment, the RICO count, charged that the six corporations constituted an “enterprise” within the meaning of the RICO Act and that the defendants had participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity that included at least two acts of concealing the property of a bankrupt. Count 3 charged that the defendants had concealed from the bankruptcy trustee of Archie’s Acres a truck and a refrigeration unit. Count 4 charged that they had concealed from Vantage’s bankruptcy trustee approximately $60,000 of cash receipts.
 
 [2]
 

 1.
 
 Count 4.
 
 To convict Guiliano on this count of bankruptcy fraud, the jury was required to find beyond a reasonable doubt: (1) that Vantage had been adjudicated a bankrupt; (2) that Vantage owned the cash receipts; (3) that the defendant had concealed or aided and abetted the concealment of the cash receipts from the bankruptcy trustee; and (4) that he had done so knowing of the appointment of the trustee and with intent to defraud the company’s creditors. 18 U.S.C. § 152.
 
 See, e.g., United States v. Micciche,
 
 525 F.2d 544 (8th Cir. 1975),
 
 cert. denied,
 
 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976);
 
 United States v. Weinbren,
 
 121 F.2d 826 (2d Cir. 1941);
 
 United States v. Yasser,
 
 114 F.2d 558 (3d Cir. 1940).
 

 The evidence, construed most favorably to the Government, established that in the summer of 1976, Guiliano, while still employed as a Vantage salesman, rented two retail stores for the purpose of selling produce that would be diverted from Vantage. The managers of the two stores, who were hired by Guiliano, ordered the Vantage produce from Guiliano or Spinale. Guiliano collected the cash from the stores, but did not turn it over to Vantage. Petroeelli never authorized Guiliano to open the two stores and he had no knowledge of Guili-ano’s activities. The cash receipts that were apparently embezzled by Guiliano were never disclosed to the bankruptcy trustee.
 

 This evidence would have sufficed to convict Guiliano of the state offense of embezzling assets belonging to Vantage, but it was insufficient to convict him of the federal offense of knowingly and fraudulently concealing the cash receipts from the bankruptcy trustee. There was no direct evidence that Guiliano knew of the adjudication of bankruptcy or of the appointment of the trustee. Nor was there any evidence from which his knowledge of either fact could reasonably be inferred. Guiliano was neither an owner nor an officer of the bankrupt, and his duties as a salesman did not require him to be familiar with its financial condition. Petroeelli, ' the sole owner, testified that even he was unaware of the company’s condition until the bankruptcy petition was filed. It is possible to speculate that when the business closed, Guiliano must have realized that an adjudication of bankruptcy would follow, but the
 
 *88
 
 record contains no evidence as to when he left Vantage or the circumstances of his leaving. Indeed, the Government offered no evidence of the defendant’s activities after August 1976, nearly two months before the adjudication of bankruptcy and the appointment of the trustee. In the absence of such evidence, a finding that the defendant somehow learned of the appointment of the trustee could only be arrived at through conjecture.
 
 See United States v. Micciehe, supra,
 
 525 F.2d at 546-47.
 

 Our conclusion that the conviction on Count 4 must be reversed is reenforced by the conspicuous absence from the Government’s brief of any mention of evidence bearing on the issue of Guiliano’s knowledge of the appointment of the Vantage trustee. Responding to Guiliano’s challenge to the sufficiency of the evidence on the element of knowledge, the Government has referred us to some facts bearing on Guili-ano’s knowledge of the appointment of the Archie Acres trustee, but it has not even attempted to justify the jury’s finding that he knew of the appointment of the Vantage trustee. Our own examination of the transcript satisfies us that the Government, in failing to refer us to any pertinent facts, has not overlooked any available evidence.
 

 2.
 
 Count 1.
 
 The jury was instructed that the crimes charged on the two counts of bankruptcy fraud constituted the two predicate acts of racketeering activity essential to conviction on the RICO count. Our reversal of the conviction on Count 4 therefore undermines the RICO conviction. In addition, we take this occasion to express some concern about the Government’s attempt to apply the RICO statute to the activities of Guiliano. It is perhaps understandable that the Government would bring a RICO charge against Spinale, who appears to have been the prime mover in what may well have been an elaborate scheme to commit a series of bankruptcy frauds. But the charge as applied to Guiliano is far more questionable. We doubt that Congress expected the statute to be used in circumstances where an embezzlement can be escalated into a federal bankruptcy fraud, and then joined with another bankruptcy fraud to form an alleged pattern of racketeering activity.
 

 3.
 
 Count 3.
 
 As noted previously, this bankruptcy fraud count charged the defendant with fraudulently concealing from the bankruptcy trustee of Archie’s Acres a truck and a refrigeration unit. The sufficiency of the evidence of knowledge presents a close question on this count as well; for there was no direct evidence that Guiliano knew of the adjudication of bankruptcy or of the appointment of the trustee, and it is undisputed that he was not employed by the bankrupt. We are persuaded, however, that the evidence was at least marginally sufficient to permit the jury to infer the requisite knowledge.
 

 The evidence, viewed in a light most favorable to the Government, showed that on the eve of the filing of the bankruptcy petition, Spinale asked Guiliano to remove the truck and refrigeration unit from the company’s premises and sell them for as much cash as possible. The defendant removed the items as requested and eventually sold them in exchange for checks bearing his name as payee. At the time the defendant removed the items, he knew that Archie’s Acres had reached a crisis point in its financial affairs. A sheriff’s sale to satisfy a judgment against the company was pending, and Guiliano had advised Spinale’s son-in-law to remove the company name from company property in order to make it “disappear.” Spinale testified that the defendant turned over to him the proceeds from the sale of the truck and refrigeration unit, but the jury was not obliged to credit this testimony. Finally, the evidence showed that the defendant continued to work closely with Spinale after the adjudication of bankruptcy and the appointment of the trustee. Spinale did not recall telling the defendant in so many words that a trustee had been appointed, but he believed that the defendant must have been aware of it.
 

 Although we think this evidence sufficient to support the appellant’s conviction on this count, we nevertheless order a retrial of this charge because of the distinct
 
 *89
 
 risk that the jury was influenced in its disposition of this count by improper evidence and by the allegations of the RICO count.
 

 Spinale’s son-in-law testified that he saw Guiliano, Spinale, and an electrical contractor leave one of the two Archie’s Acres stores one hour before a fire occurred at the store. Guiliano objected to the introduction of this testimony on the ground that it was irrelevant and would prejudice the jury. In opposing the objection, outside the presence of the jury, the Government expressly disclaimed any attempt to suggest to the jury that the fire had been set. The Government urged that the testimony was relevant because the fire helped precipitate the bankruptcy and the defendant’s presence on this occasion showed his close friendship with Spinale. The Government was entitled to prove the chain of events leading to the bankruptcy and the nature of the relationship between the defendant and Spi-nale. But the scant probative value of the testimony placing Guiliano with Spinale on this one occasion was plainly outweighed by the risk that the jury would make the very inference that the Government had specifically disclaimed. This risk was heightened when the prosecutor, in his closing argument, specifically recalled to the jury this portion of the son-in-law’s testimony.
 

 The jury’s guilty verdict on Count 3 may well have been influenced not only by the unwarranted inference that Guiliano was involved in an arson but also by the very allegation of the RICO charge. One of the hazards of a RICO count is that when the Government is unable to sustain a conviction under this statute, it will have to face the claim that the prejudicial effect of tarring a defendant with the label of “racketeer” tainted the conviction on an otherwise valid count. That claim, of course, need not always or even often prevail, but it does in this instance when the evidence was barely sufficient to permit an inference of the disputed element of knowledge and considerable prejudice was injected by placing Guiliano at the store just before the fire. We think the “just” disposition “under the circumstances,” 28 U.S.C. § 2106, is a retrial on Count 3.
 

 Judgment reversed as to Counts 1 and 4; retrial ordered as to Count 3.
 

 [1]
 

 . Guiliano was sentenced on each count to a term of imprisonment of five years, the sentence on the RICO count to be served concurrently with the sentence on one of the two counts of bankruptcy fraud (Count 4). The sentence on the remaining count of bankruptcy fraud (Count 3) was suspended and the defendant was placed on probation for a period of five years, to run consecutively to the other sentences. The Court also imposed a RICO forfeiture of $30,000, which the jury had determined to be the extent of Guiliano’s illicit gain from the operation of the alleged enterprise.
 

 [2]
 

 . Count 2 charged that Spinale had mailed a fraudulent financial statement of Archie’s Acres pursuant to a scheme to defraud its creditors in violation of 18 U.S.C. § 1341. Spinale entered into a plea agreement with the Govemment prior to trial, pleading guilty to the bankruptcy fraud charged in Count 3, and promising to cooperate with the Government on other investigations, in exchange for a dismissal of the other charges.