UNITED STATES of America, Plaintiff-Appellee,

v.

Claude Roger DUMAS, Defendant-Appellant.

No. 81–1387.

United States Court of Appeals, Tenth Circuit.

Aug. 31, 1982.

In reviewing the conviction we must view the evidence in the light most favorable to the government to determine whether it was sufficient for any rational trier of fact to find Dumas guilty beyond a reasonable doubt. *See, e.g., Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Twilligear*, 460 F.2d 79, 81–82 (10th Cir. 1972). The government relied mostly on the testimony of Perry Taaca, M.D., the alleged unindicted coconspirator. Taaca testified that in March 1980 Dumas offered to sell him a large diamond. When Taaca expressed interest but said he had little cash, Dumas agreed to sell him the diamond in exchange for $2,000, "a number of Dilaudid pills, and . . . another payment on it later." Taaca wrote several false prescriptions by which he personally obtained the pills. Dumas then met with Taaca, gave him what purported to be the diamond, and received from Taaca $2,000 and the pills.

About a week later Dumas called Taaca and told him he had switched gems on him; and if Taaca wanted the diamond he had first seen and had appraised, he would have to give Dumas more money or more pills. Taaca then obtained more Dilaudid by writing additional false prescriptions. When Taaca handed over this Dilaudid, Dumas told Taaca he had not yet obtained the real diamond and would need more pills to get it out of hock.

Taaca then called a pharmacist in Poteau, Oklahoma, who previously had filled prescriptions for him in the course of his medical practice. Taaca told the pharmacist he wanted the Dilaudid to aid a friend who owed a gambling debt. The pharmacist refused to sell Taaca the Dilaudid, and instead notified an examiner for the State Board of Pharmacy. The examiner, in turn, gave the information to the Oklahoma State Bureau of Narcotics and Dangerous Drugs, which sent agents to the pharmacy.

Michael P. Carnes, Dallas, Tex. (Joe M. Joiner, Sherman, Tex., and Thomas D. Glenn, Dallas, Tex., with him on the brief), for defendant-appellant.

G. Steven Stidham, Asst. U. S. Atty., Muskogee, Okl. (Betty Outhier Williams, U. S. Atty., Muskogee, Okl., with him on brief), for plaintiff-appellee.

Before HOLLOWAY, LOGAN and SEYMOUR, Circuit Judges.

LOGAN, Circuit Judge.

Claude Roger Dumas appeals his conviction for conspiring to obtain possession of Dilaudid, a Schedule II controlled substance, by misrepresentation, fraud, forgery, deception, or subterfuge, a violation of 21 U.S.C. § 846.[1] On appeal, among other contentions, Dumas argues the evidence was insufficient to support his conviction. We agree and, therefore, discuss only that issue.

---

[1] Section 846 proscribes a conspiracy to commit any offense defined in the Controlled Substances Act, one of which is knowingly or intentionally "acquir[ing] or obtain[ing] possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge." *See* 21 U.S.C. § 843(a)(3).

The agents asked the pharmacist to call Taaca and offer to sell him the Dilaudid.

After receiving the pharmacist's call, Taaca mailed him six false prescriptions. On July 26, 1980, he traveled to Poteau where, upon receiving the Dilaudid, he was arrested by the narcotics agents. Dumas was arrested five months later in Texas.

■ Dumas contends he never knew how Taaca was going to obtain the Dilaudid, and therefore he never conspired with Taaca to obtain the drug "by misrepresentation, fraud, forgery, deception, or subterfuge." The essence of the crime of conspiracy is an agreement to commit an unlawful act. *E.g., Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975). Although the agreement may be inferred from the facts and circumstances of the case, and "need not take any particular form, there must at some point be a meeting of the minds in the common design, purpose, or objects of the conspiracy." *United States v. Butler*, 494 F.2d 1246, 1249 (10th Cir. 1974). To be guilty of conspiracy, a defendant must possess "*at least* the degree of criminal intent necessary for the substantive offense itself." *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959). For instance, since substantive offenses relating to illegal importation of drugs require knowledge that the drugs were illegally imported, so too does the offense of conspiring to commit those substantive offenses. *United States v. Butler*, 446 F.2d 975, 978 (10th Cir. 1971). The defendant lacks the requisite criminal intent if he does not know the conspiracy's objective. *See, e.g., Direct Sales Co. v. United States*, 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943); *United States v. Andolschek*, 142 F.2d 503, 507 (2d Cir. 1944) (L. Hand, J.); *cf. United States v. Gallishaw*, 428 F.2d 760,

763 (2d Cir. 1970) (one who rents a machine gun to another cannot be convicted of conspiring to rob a bank unless he knows the gun will be used for that purpose, rather than merely for *some* unlawful purpose). The government must show the defendant's knowledge by clear, unequivocal evidence. *Direct Sales Co.*, 319 U.S. at 711, 63 S.Ct. at 1269.

■ In the instant case the government unequivocally showed that Dumas intended to obtain Dilaudid, but not whether he agreed to obtain Dilaudid "by misrepresentation, fraud, forgery, deception, or subterfuge."[2] Only two items of evidence suggest Dumas knew Taaca was going to obtain the Dilaudid by using false prescriptions. The first one is very weak: Dumas was in Poteau the day Taaca arrived there, which was the day before Taaca picked up the pills and was arrested. The jury could infer that Dumas was in Poteau because he knew Taaca was going there to obtain the Dilaudid from the pharmacist. However, Taaca testified that he and Dumas had *not* arranged to meet in Poteau, nor had they arranged any subsequent meeting. Further, Taaca's attorney, who knew Dumas, testified that when he was in Poteau that afternoon and saw Dumas and told him Taaca was going to be in town that evening, Dumas replied he had not known of that. Dumas terms his presence that day in Poteau a coincidence.

The other evidence is the testimony of Taaca as to a conversation he had with Dumas shortly after the pharmacist called Taaca with the offer to sell the Dilaudid:

"Q. And what was the nature of that conversation?

A. He [Dumas] wanted to know if I had been able to get any more pills,

---

**2.** The government contends it did not have to show that Dumas knew the specific means Taaca would use. We would agree that Dumas did not need to know whose name would be used on the prescriptions or to which pharmacist Taaca would send them. *Cf. Frohwerk v. United States*, 249 U.S. 204, 209, 39 S.Ct. 249, 251, 63 L.Ed. 561 (1919) (one may conspire to rob without agreeing as to the means of committing the robbery or the particular person to be robbed). But the government did have to show Dumas knew Taaca was going to obtain the pills by fraud, forgery, misrepresentation, etc. *Cf. United States v. Micciche*, 525 F.2d 544, 547 (8th Cir. 1975) (for conviction under 18 U.S.C. § 152 government must show defendant concealed assets with specific intent to defeat bankruptcy proceedings).

and I told him, well, the pharmacist I had talked to had called back and said that I could still get them if he [Dumas] wanted them.

Q. What did you do in response to that call, doctor?

A. I think we discussed, you know, what pharmacist it was, I think I told him it was a pharmacy in Poteau, and we discussed who would pick the pills up.

Q. What were the initial arrangements in that regard?

A. Well, initially I was to write some prescriptions and mail them to the pharmacy in Poteau, and then the defendant could pick the pills up under those names."

R. II, 94. From this testimony the jury could conclude that Dumas knew Taaca was obtaining the pills by using false prescriptions. However, a few minutes later, on cross-examination Taaca specifically denied ever telling Dumas how Taaca was going to obtain the Dilaudid:

"Q. Now, isn't it also a fact that during this period of time from March until July 26th [the duration of the purported conspiracy], that you yourself never told Mr. Dumas how you were going to get those drugs, isn't that a fact?

A. From what period of time, sir?

Q. From March of 1980, until July 26th of 1980.

A. That's correct."

R. II, 111. On redirect the government did not ask Taaca to explain his apparently inconsistent testimony, nor did the government during closing argument attempt to reconcile the testimony or suggest any explanation for Taaca's denial.

■ The government argues that because Taaca untruthfully told Dumas that Taaca did not have a narcotics license, Dumas would have thought Taaca could not himself obtain narcotics and dispense them to Dumas, and therefore Dumas would have thought Taaca would resort to fraudulent means to obtain the Dilaudid. But this information also suggests Taaca would not use false prescriptions to obtain the pills—a doctor who lacks a narcotics license can neither obtain narcotics for use in his practice nor prescribe narcotics for his patients. *See* 21 U.S.C. §§ 353, 822. Thus if Dumas knew the consequences of not having a narcotics license, a matter of some conjecture, then Dumas likely would believe Taaca would obtain them from a fellow doctor or purchase them from a manufacturer's representative or an unscrupulous pharmacist who would not insist on receipt of a false prescription.

The government also resorts to the long-standing rule that a party to a continuing conspiracy may be responsible for substantive offenses a coconspirator commits even if the party was unaware they were going to be committed. *See, e.g., Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946). But that has no application to this case. Although a conspirator may be convicted of *committing* those substantive offenses, he has not *agreed* to commit them (and therefore cannot be convicted of conspiring to commit them) unless he knew they were going to occur.

In the absence of clear, unequivocal evidence that Taaca *told* Dumas he would obtain the Dilaudid by use of false prescriptions, we can charge Dumas with that knowledge only if, under the circumstances, we can *infer* that knowledge. If Dumas had reason to believe that Taaca could obtain Dilaudid only by writing false prescriptions, then perhaps he could be charged with that knowledge, and therefore with having agreed to participate in that scheme. However, alternative means might readily have been available to Taaca. A doctor might himself obtain the pills and dispense them, then falsify his records to conceal the improper dispensing. *See, e.g., United States v. Badia,* 490 F.2d 296, 297 (1st Cir. 1973). Alternatively, a doctor might convince the pharmacist to sell him the pills without a prescription. *See, e.g., United States v. Nocerino,* 474 F.2d 993 (2d Cir.), *cert. denied,* 412 U.S. 942, 93 S.Ct. 2785, 37

L.Ed.2d 402 (1973). Additionally, a doctor might be able to obtain the pills from a manufacturer's representative or another doctor without making a false statement as to his intended use of the pills.

Obviously Dumas has committed some crime and deserves punishment. But in our view he was either charged with the wrong crime, or charged with the right crime but the government failed to prove it, by not getting its principal witness to explain away the conflict in his testimony or presenting other evidence to show Dumas knew the means by which Taaca would obtain the Dilaudid. By specifically stating that he never informed Dumas how he was going to obtain the pills, Taaca in his testimony left the evidence against Dumas "as consistent with innocence as it is with guilt." *Halfen v. United States*, 324 F.2d 52, 55 (10th Cir. 1963). On the evidence in this record the jury should have had a reasonable doubt whether Dumas had the requisite knowledge of the purported conspiracy's unlawful objective.

REVERSED.