**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Arthur M. NEWMAN,**
**Defendant-Appellant.**

**No. 82-1182.**

United States Court of Appeals,
Tenth Circuit.

May 7, 1984.

Julius Lucius Echeles, Chicago, Ill. (Frederick F. Cohn and Caroline Jaffe, Chicago, Ill., with him on the briefs), for defendant-appellant.

Brian G. McConaty, Sp. Asst. U.S. Atty., Denver, Colo. (Robert N. Miller, U.S. Atty., and Robert T. McAllister, Asst. U.S. Atty., Denver, Colo., with him on the brief), for plaintiff-appellee.

Before BARRET, McKAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Defendant, Arthur Newman, appeals his convictions on nine of ten counts of an indictment against him. The jury found defendant guilty of conspiracy to distribute and to possess with intent to distribute various controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); possession of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 2); possession of methaqualone with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 3); distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts 4, 6, and 7); distribution of methaqualone in violation of 21 U.S.C. § 841(a)(1) (Count 5); attempting to use extortionate means to collect an extension of credit in violation of 18 U.S.C. § 894 (Count 8); and use of a telephone to facilitate a drug offense in violation of 21 U.S.C. § 843(b) (Count 10). The jury acquitted defendant on count 9, obstruction of justice.

## I

On August 26, 1980, a federal district judge signed an order permitting federal investigators to place a "bug" in defendant's home and to tap his phone line. On September 25, 1980, the judge extended the time for the interception of communications. Defendant argues that the admission of evidence obtained through wiretapping and bugging violated his rights under the Fourth and Sixth Amendments as well as his rights under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520.

## A

■ First, defendant argues that an appropriate person did not authorize the applications made to the federal district judge. The only persons who may authorize such an application are the Attorney General and "any Assistant Attorney General specially designated by the Attorney General." 18 U.S.C. § 2516(1). Philip B. Heyman, who is described in the applications as "Assistant Attorney General, Criminal Division," authorized the applications at issue here. Defendant complains because neither the applications nor the accompanying affidavit state that the Attorney General specially designated Heyman to authorize the applications. We reject defendant's argument. A wiretap authorization order is presumed proper, *United States v. Jabara,* 618 F.2d 1319, 1326–27 (9th Cir.), *cert. denied,* 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980) and 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 70 (1980), and defendant has offered no evidence to overcome that presumption. *See United States v. Kerr,* 711 F.2d 149, 150–51 (10th Cir.1983) (Assistant Attorney General Heyman authorized to seek wiretap orders).

## B

■ Federal investigators used results from a pen register in the applications for interception orders. Defendant argues that this was improper because there was not sufficient cause for the authorization of the pen registers. We disagree. The installation and use of a pen register is not a search for purposes of the Fourth Amendment. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). Thus, no showing of probable cause—or even "sufficient cause," as defendant suggests—is necessary to justify authorization of a pen register.

## C

Defendant argues that the affidavit submitted with the applications for interception does not support the required findings of probable cause. Before a court may issue an order permitting interception, it must determine, on the basis of the facts set out in the application, that

"(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning the offense will be obtained through such interception;

. . . .

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person."

18 U.S.C. § 2518(3).

■ Defendant makes two arguments in support of his contention. First, he claims that information in the affidavit about defendant's criminal activity that was supplied by a confidential informant (later revealed to be James Roberts) does not meet the requirements of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Under *Aguilar* and *Spinelli,* when information from a confidential informant is necessary to a finding of probable cause

to believe a crime is being committed, an affidavit for a warrant must allege (1) underlying circumstances from which the informant concluded the facts he related, and (2) underlying circumstances that led the affiant to believe that the informant was credible. The Supreme Court has now abandoned the *Aguilar-Spinelli* two-pronged test in favor of a "totality of the circumstances" test. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). We need not decide whether the *Gates* less restrictive rule applies here, however, because the affidavit satisfies the *Aguilar-Spinelli* requirements. Roberts informed a police officer, Sergeant Leuthauser, about transactions in which he was involved. Roberts derived the information from his own observation of and participation in the transactions. To demonstrate Roberts' credibility, Sergeant Leuthauser stated that Roberts had given him reliable information for more than a year.

Defendant's second attack on the sufficiency of the affidavit is that the affidavit contains contradictory and false statements. The only statement defendant identifies as false is Sergeant Leuthauser's statement that Roberts had given him reliable information for more than a year. At trial, defense counsel stipulated that Sergeant Leuthauser's statement was correct. Defendant's arguments have no merit.

### D

Defendant contends that the applications do not comply with 18 U.S.C. §§ 2518(1)(c) and 3(c). Section 2518(1)(c) requires that an application contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Before approving interception of oral or wire communications a judge must determine that "normal investigative procedures have been tried and have failed

or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

■ The affidavit submitted in support of the application described the investigation that had been conducted before the application for wiretap and bugging orders. The investigators had used surveillance and confidential informers to gain information about Newman's involvement in the distribution of drugs as well as his suspected involvement in the interstate transportation of stolen jewelry. The investigation had failed to reveal the source of the drugs, the extent of the drug conspiracy, or the extent of the suspected jewelry conspiracy. This Court has held that the determination of the dimensions of an extensive drug conspiracy justifies the use of electronic surveillance. *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir.), *cert. denied*, 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981). The affidavit in this case provided sufficient basis for the judge to make the finding required under § 2518(3)(c).

### E

■ Defendant claims that the investigators violated the interception orders and his Sixth Amendment right to counsel by failing to screen out privileged communications between defendant and his attorney.[1] Defendant raised this argument at trial. After listening to the tapes that defendant offered in support of his argument, the trial court found that the investigators had not interpreted any privileged communications. On appeal, defendant identifies no specific privileged communications that were intercepted. Thus, we must conclude that the trial court was correct.

### F

■ Defendant argues that the investigators violated the interception orders by

---

**1.** Because defendant demonstrates no interception of privileged communications we do not consider what the appropriate remedy would be if the investigators had intercepted privileged communications. *Cf. United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981) (remedies for deprivation of Sixth Amendment rights must be tailored to the situation).

continuing to intercept communications for several days after the search of his residence. Under Title III, an order may authorize interception of communications for as long as necessary to achieve the objectives of the interception, but not longer than thirty days. 18 U.S.C. § 2518(5). One objective of the interception of defendant's communications was to identify other members of the drug conspiracy. The search of defendant's residence did not foreclose the possibility that defendant would call or receive calls or visits from as yet unidentified members of the drug conspiracy. We find no violation of Title III in the continued interception after the search.

## II

Defendant urges that we remand his case for a hearing to determine whether he was prejudiced by the following situation: Two of defendant's co-defendants, Gina Carriero and Walter Zelinka, requested help from defendant's attorney, Alan Dill, in finding counsel. Dill recommended Rod Snow, who had previously been an assistant United States Attorney in Colorado. Snow apparently entered an appearance on behalf of Carriero and Zelinka but withdrew when he learned that he had authorized an application for the use of a pen register on defendant's phone. The application did not mention Carriero or Zelinka. At a pre-trial hearing Zelinka's new counsel requested an evidentiary hearing on the possibility of conflict of interest. The trial court refused the request. Carriero and Zelinka subsequently pleaded guilty, and defendant stood trial alone.

■ Defendant does not explain and we cannot perceive how Mr. Snow's involvement in this case could have prejudiced defendant. We reject the argument as meritless.

## III

■ Defendant contends that the trial court erred in failing to order a competency hearing when defendant failed to appear on the last day of trial. A trial court must order a hearing to determine the defendant's competency if information comes to the trial court's attention that raises a bona fide doubt about the defendant's competency to stand trial. *Pate v. Robinson,* 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966). A defendant is competent to stand trial if he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him. *United States v. Smith,* 521 F.2d 374, 377 (10th Cir.1975). Defendant suggests that a bona fide doubt about defendant's competency arose when defendant did not appear in court on the last day of his trial. While Alan Dill, defendant's attorney, was looking for defendant, Daniel Smith, an attorney assisting Dill, told the trial court that defendant had been unable to assist counsel in his defense because of his use of narcotics. The following exchange occurred:

"MR. SMITH: Your Honor, initially we would object to continuing the trial without Mr. Newman; but another concern that I have and I know Mr. Dill has at this point in time—and we've had it since about last Thursday—and it has been increased every day during this trial. I can only say that in my mind—and I know in Mr. Dill's mind—it's very increased this morning with Mr. Newman not appearing—We attempted since last Thursday to discuss the various plea negotiations with my client, Mr. Zelinka, as well as with Mr. Newman. Mr. Newman was, we felt, not in a mental frame of mind because of what appears to us as the ingestion of narcotics to discuss the plea offers.

The first time that we saw Mr. Newman where he appeared to be able to intelligently discuss this type of thing was Monday morning. Every night since this trial started on Monday, Mr. Dill and I have met with Mr. Newman at our offices to discuss the happenings of that day in trial and various defense strategies and what have you; and his mental condition has without exception changed

drastically from the time we left the courtroom until he would come to our offices.

THE COURT: He wouldn't come directly?

MR. SMITH: Excuse me?

THE COURT: He wouldn't come directly from the Court to your office?

MR. SMITH: No. We were not traveling together. We would go back to the office in our vehicles and Mr. Newman, it's our belief—our understanding from what he'd told us—would stop at his apartment and then come to our office.

That effect was very noticeable last evening; and when we finished probably a two-hour session with Mr. Newman last evening, he was, for lack of a better description, about as bad as I've ever seen him. He did not appear to be in control of his mental faculties. He was very emotional, very upset.

It's my belief that he is not—and I have nothing to base this on other than my impression of the gentleman having discussed various things with him since the middle of October of 1980—that he has ingested something and is just not able to be here.

Our concern, very simply, your Honor, is that Mr. Newman is unable to assist us in his defense. He may very well not be competent to assist us and stand trial. I do not want to raise this a month from now or have him raise it through Mr. Dill or myself or someone else a year from now under the provisions of Title 18, section 4245, I believe; but I am genuinely concerned about his competency.

THE COURT:· I'm sure you are. He appears to be competent during the course of the trial; and if he is not competent at some other times, it is strictly his own doing, if he is ingesting certain amounts of drugs."

R. IX, 547–49.

■■■■ The trial court observed defendant testify at a pretrial hearing and during the trial. When defense counsel questioned defendant's competency, the trial court stated that defendant appeared to be competent and that his voluntary use of narcotics did not render him incompetent. We find nothing in the record that contradicts the trial court's assessment of defendant's mental capacity. A court need not order a competency hearing sua sponte simply because the defendant uses drugs. *Reed v. United States*, 529 F.2d 1239, 1241 (5th Cir.), *cert. denied*, 429 U.S. 887, 97 S.Ct. 241, 50 L.Ed.2d 169 (1976). We find no merit in defendant's argument.

## IV

■■■■ Defendant argues that he was deprived of his Sixth Amendment rights because attorney Daniel Smith assisted defendant's attorney, Alan Dill, at trial and defendant had not consented on the record to Smith's participation. Smith represented Joseph Zelinka, one of defendant's original co-defendants. Zelinka had pleaded guilty and was awaiting sentencing at the time of defendant's trial. Even if Smith's involvement with both Zelinka and defendant constituted multiple representation and created a potential conflict of interest, we perceive no Sixth Amendment violation. Defendant does not claim that he was prejudiced by Smith's participation. When a defendant raises no objection at trial, he must show that an actual conflict of interest adversely affected his representation to establish a violation of the Sixth Amendment. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).

## V

■■■■ Defendant contends that the trial court's decision to continue the trial despite defendant's failure to appear on the last day violated his right to due process. There is no merit to this contention. A trial may continue if a defendant voluntarily absents himself after the trial has begun. *Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973).

■■■■ Defendant also complains because the trial court gave no instruction regarding his absence. Defense counsel

offered no proposed instruction in regard to that absence. Indeed, the trial court announced that it had prepared such an instruction but thought that everyone agreed it should not be given. Defense counsel did not comment or object. "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Fed.R.Crim.P. 30. Omission of an instruction that was not requested requires reversal only if it constitutes plain error. *United States v. Kilburn,* 596 F.2d 928, 935 (10th Cir.1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1517, 59 L.Ed.2d 782 (1979). We perceive no such error in this case.

## VI

Defendant contends that the government produced insufficient evidence to support a conviction on count 8, for using extortionate means to collect or attempt to collect an extension of credit or to punish a person for the nonrepayment of an extension of credit. 18 U.S.C. § 894.

In April 1980 Joseph Amon was arrested for selling controlled substances. He agreed to cooperate with law enforcement agencies in their investigation of defendant. On May 15, 1980, Amon wore a tape recorder to defendant's apartment and recorded a conversation in which Amon said he would try to pay defendant $1000 a month toward the money he owed defendant. Several days later Amon returned to defendant's apartment, again wearing a tape recorder. Defendant told Amon that three people had told him that Amon was "talking to drug enforcement." Defendant demanded that Amon lift up his shirt; Amon refused and left defendant's apartment.

James Roberts testified that in June 1980 defendant asked him to break Amon's arms and told him to tell Amon, "Go get your daddy now." R. VII, 240–41, 254. In July Roberts brought James Rasmussen, an undercover agent, to defendant's apartment

and told defendant Rasmussen would break Amon's arms for defendant. The bugging device recorded defendant saying, "No messages, just break his fuckin' arms." R. VII, 254. Roberts testified that he interpreted that to mean he did not have to convey any message to Amon when he broke his arms. R. VII, 254. The bug also picked up this sentence fragment: "12,000 thinks he can get away with it." At trial the prosecutor asked Roberts what that fragment meant. Roberts said: "He told me Dr. Amon owed him $12,000 and that's why he was going to have his arms broken." R. VII, 254.

Amon cooperated with the investigators by wearing a cast on his arm. When Rasmussen and Roberts went to defendant's apartment defendant said, "Start with him again." The prosecution asked Roberts what that meant to him, and he said, "That we were to continue breaking arms or legs or whatever to get him to pay the money and leave town." R. VII, 280. In a later conversation defendant said to Roberts, "And don't spend my money. That guy that you broke an arm on that's what he did. He spent my money." R. VII, 318.

Defendant was convicted under 18 U.S.C. § 894, which provides, in pertinent part:

"(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof,

shall be fined not more than $10,000 or imprisoned not more than 20 years, or both."

In the instant case there was no conspiracy to punish because there can be no conspiracy involving only defendant and government informers. *United States v. Martino,* 648 F.2d 367 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982) and 456 U.S. 949 (1982); *United States v. Tombrello,* 666 F.2d 485, 490 n. 3 (11th Cir.1982). *See also United*

*States v. Dumas,* 688 F.2d 84, 86 (10th Cir.1982) (conspiracy requires a meeting of the minds). There also was no actual punishment, nor did defendant succeed in collecting from Amon. The trial court obviously recognized that there was not a conspiracy to punish or a successful punishment or collection because the instructions to the jury dealt with attempted collection under § 894. Thus we must determine whether the record contains sufficient evidence that a rational jury could find that defendant attempted to collect, by extortionate means, his extension of credit to Amon. The record is clear that defendant attempted to punish Amon, hiring Roberts and Rasmussen to break Amon's arm and paying them after defendant thought they had succeeded. Evidence in the record would support a jury finding that defendant sought to punish Amon because he thought Amon was an informant. But that does not preclude the possibility defendant was trying to collect the money. Much of the evidence that defendant sought to punish Amon for failure to pay his debt is the informant Roberts' interpretation, which can be compared to the taped conversations between Roberts and defendant. The tapes are not entirely intelligible, however, and one taped sentence fragment was, "12,-000 thinks he can get away with it." We believe this evidence, along with the permissible inferences from the fact Amon owed defendant $12,000 and defendant hired two people to break his arms, is sufficient to support the jury's verdict that defendant was attempting to collect the debt Amon owed.

AFFIRMED.