UNITED STATES of America, Plaintiff,

v.

Ceferino CASTILLO–GARCIA, Jaime Olivas–Sanchez, Jesus Saul Bujanda–Ibarra, Ismael Armendariz–Amaya, Jeffrey Samuel Pino, Victor Julio Avila, Jr., Anita Pino, Ray Gutierrez, Larry Pino, Doug Tierney, John Sheridan, Apolonio Portillo–Rodriguez, Alonso Moreno, Matt Hilton, Thomas McCulloch, Alberto Avila, Jack Girard, and Joanne Ayers, Defendants.

Criminal A. No. 94–CR–371–N.

United States District Court,
D. Colorado.

March 25, 1996.

David M. Gaouette, Assistant U.S. Attorney, Denver, CO, for U.S.

Felix Garcia, Denver, CO, for Jaime Olivas–Sanchez.

Virginia L. Grady, Assistant Federal Public Defender, for Ismael Armendariz–Amaya.

Robert S. Berger, Denver, CO, for Anita Pino.

Richard J. Banta, Denver, CO, for Larry Pino.

Seth J. Benezra, Roman & Benezra, Denver, CO, for John Sheridan.

David J. Dansky, Chambers, Dansky and Hansen, Denver, CO, for Ceferino Castillo–Garcia.

Harvey A. Steinberg, Springer and Steinberg, P.C., Denver, CO, for Jesus Saul Bujanda–Ibarra.

Ronald A. Podboy, Denver, CO, for Jeffrey Samuel Pino.

James A. Castle, Denver, CO, for Ray Gutierrez.

Jeffrey E. Fossum, Denver, CO, for Doug Tierney.

Arthur S. Nieto, Denver, CO, for Alonso Moreno.

David C. Japha, Denver, CO, for Matt Hilton.

Elisa J. Moran, Denver, CO, for Alberto Avila.

Christopher C. Cross, Cross & Heckenbach, P.C., Englewood, CO, for Joanne Ayers.

Richard N. Stuckey, Denver, CO, for Thomas McCulloch.

Kerry S. Hada, Englewood, CO, for Jack Girard.

## MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

The indictment in this case charges eighteen[1] named defendants in eight counts. The first two counts are separate, but overlapping, conspiracy charges—one being a conspiracy to distribute (and possess with intent to distribute) cocaine and the other being a conspiracy to distribute (and possess with intent to distribute) marijuana—all in violation of 21 U.S.C.A. §§ 841(a)(1) and 846 (West 1981 & Supp.1995). The next six counts are substantive drug charges, including possession of cocaine with intent to distribute it, attempted possession of marijuana with intent to distribute it, and use of the telephone to facilitate a drug transaction. The final two charges are a money laundering charge and a charge alleging that one defendant violated an immigration law prohibiting illegal re-entry into the United States by an alien who has previously been convicted of an aggravated felony.

■ The matter is before the court on numerous motions[2] to suppress evidence obtained as a result of five separate wiretaps utilized by the Government during the underlying investigation of this case. The court held a hearing and took evidence concerning defendants' motions to suppress. At the conclusion of the hearing, the court made oral findings and conclusions concerning most of the arguments raised by defendants. Two issues, however, were taken under advisement. The primary issue is whether the wiretap applications for any or all of the five wiretaps sufficiently complied with a statutory mandate that the applications contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous"—sometimes called the "necessity requirement." See 18 U.S.C.A. § 2518(1)(c) (West 1970). A secondary issue taken under advisement is whether the Government conducted the wiretaps in such a way as to minimize the interception of communications not otherwise subject to interception—the "minimization requirement." See 18 U.S.C.A. § 2518(5) (West Supp.1995). The following recitation constitutes the

1. Two defendants have never been apprehended. Seven others have entered negotiated pleas of guilty. Thus, the case involves nine defendants who are presently before the court.

2. For purposes of this Memorandum Opinion and Order, the following motions are treated together: Defendant Bujanda–Ibarra's "Motion to Suppress Various Wire Interceptions and the Fruits Thereof"; Defendant Castillo–Garcia's "Motion to Suppress Evidence Derived from Wire Interception WT–10"; Defendant Anita Pino's "Motions to Suppress Wire Interceptions and the Fruits Thereof"; Defendant McCulloch's "Motion to Join Wiretap Suppression Motion"; and Defendant Olivas–Sanchez's "Motion to Join Co–Defendant Jesus Bujanda–Ibarra's Motions for Discovery Pertaining to Intercepted Communications and Motion to Suppress Various Wire Interceptions and the Fruits Thereof."

Additionally, nearly all defendants have filed motions to join other defendants' motions. Accordingly, to the extent such motions are pending with respect to the wiretap issue, those motions are also incorporated herein. The United States has not raised a standing argument with respect to any motions to suppress. For practical purposes, because nearly all defendants have moved to suppress evidence obtained as a result of the wiretaps, I have not addressed issues of standing. See generally United States v. Simpson, 813 F.2d 1462, 1471 n. 11 (9th Cir.) (standing to challenge wiretap existed based upon grounds that defendant was a party to an intercepted communication and because a conversation was intercepted on his premises) (citation omitted), cert. denied, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987).

court's findings of fact and conclusions of law on these two issues.

## FINDINGS OF FACT

### I. BACKGROUND OF THE INVESTIGATION

According to affidavits which he submitted in support of the five wiretap applications, Denver Police Detective Stephen F. Barnhill (working as a special federal officer "deputized" by the Federal Bureau of Investigation) began participating in the investigation underlying the present indictment in July 1994. On July 1, 1994, Detective Barnhill arrested a person possessing one-and-one-quarter kilograms of cocaine. That person, identified throughout the record only as "CW [Cooperating Witness]–1," immediately identified his supplier as one Rosario Portillo–Rodriguez and offered to cooperate in an investigation of the supplier. CW–1 claimed to have purchased approximately twenty-two kilograms of cocaine from Rosario Portillo–Rodriguez between June 1993 and July 1, 1994. He also disclosed details about Rosario Portillo–Rodriguez's cocaine distribution network, many of which were confirmed over the next month as the investigation proceeded.

Immediately after his arrest, CW–1 began assisting Detective Barnhill and others in gathering evidence about Rosario Portillo–Rodriguez's operation. Between July 1, 1994, and August 4, 1994, CW–1 met frequently with Rosario Portillo–Rodriguez to negotiate CW–1's purchase of cocaine on consignment. CW–1 also placed calls to, and/or received calls from, a telephone and a cellular telephone which Rosario Portillo–Rodriguez used in his cocaine distribution operation. Nearly all of these conversations were monitored and recorded. Law enforcement agents observed the meetings when it was possible to do so, and on four occasions Rosario Portillo–Rodriguez delivered multi-ounce quantities of cocaine to CW–1 as the officers watched and/or listened.

3. Although none of the wiretap applications disclose the exact status of Baudelio Portillo–Rodriguez or José Portillo–Rodriguez, I take judicial notice of their status from this court's file in *United States v. Baudelio Portillo–Rodriguez and*

The monitored conversations with Rosario Portillo–Rodriguez and the surveillance conducted by law enforcement officers disclosed that Rosario Portillo–Rodriguez periodically received multi-kilogram shipments of cocaine from a source in the area of El Paso, Texas or Juarez, Mexico. The cocaine was delivered to and stored at 4331 Raritan Street in Denver, a couple of blocks from Rosario Portillo–Rodriguez's residence at 4500 Raritan Street. It was then re-packaged and distributed from the detached garage associated with the residence at 4331 Raritan Street. Baudelio Portillo–Rodriguez and Joeé Portillo–Rodriguez, Rosario's brothers and fugitives on cocaine distribution charges pending in this court, apparently lived at 4331 Raritan Street.[3] Other persons, some unknown and others known to the observing officers from previous drug arrests, came and went from 4331 Raritan Street. They appeared to be delivering cocaine to the residence or picking up cocaine for further distribution.

CW–1 had never been introduced to Rosario Portillo–Rodriguez's source of cocaine, although it is unclear whether he ever sought an introduction, either before or after he began cooperating with law enforcement officers. He also did not know other people who distributed cocaine for Rosario Portillo–Rodriguez's organization. It was clear, however, that Rosario Portillo–Rodriguez used his home telephone and cellular telephone to negotiate cocaine transactions and that he frequently forwarded calls from both telephones to his pager. Detective Barnhill thus applied for the first wiretap at issue, covering Rosario Portillo–Rodriguez's home telephone, cellular telephone, and pager.

### II. DETAILS CONCERNING THE FIVE WIRETAPS

The five wiretaps in question intercepted communications on five separate telephones, one cellular telephone (Rosario Portillo–Rodriguez's), and three digital pagers. The telephones were located at seven distinct, geo-

*José Portillo–Rodriguez,* Case No. 91–CR–356. Baudelio was later apprehended and sentenced to a term of imprisonment. José remains a fugitive.

graphically-separate locations. Telephone records indicated that the telephones were subscribed (sometimes jointly) in the names of nine persons, only two of whom were eventually indicted in this case. Specifically, the telephone numbers, locations, and subscribers are as follows:

### (1) First Wiretap: 94–WT–4 (issued August 19, 1994)

This first wiretap order intercepted communications from: (1) telephone number (303) 480–1955, subscribed to Veronica L. Portillo, 4500 Raritan Street, Denver, Colorado; (2) cellular telephone (303) 877–2046, subscribed to Veronica Portillo; and (3) digital display paging device (303) 852–2771, subscribed to Veronica Portillo and Rosario Portillo–Rodriguez, doing business as P & R Concrete [hereinafter collectively referred to as the "First Wiretap"]. The suspects named in the First Wiretap were: Rosario Portillo–Rodriguez; José Portillo–Rodriguez; Baudelio Portillo–Rodriguez; Defendant Apolonio Portillo–Rodriguez; and James Scott Sedgley. The First Wiretap terminated September 17, 1994.

### (2) Second Wiretap: 94–WT–7 (issued September 22, 1994; extended on October 21, 1994)

The second wiretap order, issued five days after termination of the First Wiretap, intercepted communications from telephone numbers (303) 431–4345, subscribed to Fidela Armendariz, 6550 Benton Street, Arvada, Colorado, and (303) 292–1131, subscribed to Defendant Anita Pino, 5138 Milwaukee Street, Denver, Colorado [hereinafter collectively referred to as the "Second Wiretap"]. The suspects named in the Second Wiretap were: Rosario Portillo–Rodriguez; Defendant Ceferino Castillo–Garcia; and Defendant Ismael Armendariz–Amaya. The wiretap on (303) 431–4345 terminated September 27, 1994. An extension was granted with respect to the wiretap on (303) 292–1131. The extension added Defendant Jeffrey Samuel Pino, Defendant Anita Pino, Defendant Jesus Saul Bujanda–Ibarra, and "Andy" (last name unknown) to the list of suspects, and it terminated October 24, 1994.

### (3) Third Wiretap: 94–WT–8 (issued September 22, 1994)

The third wiretap order, issued five days after termination of the First Wiretap and contemporaneously with the Second Wiretap, intercepted communications from digital display paging devices (303) 251–1594, subscribed to Ruben Martinez, 3549 Shoshone Street, Denver, Colorado, and (303) 609–1931, subscribed to Raul Ferrnandez, 380 Bannock, apartment number 1865, Denver, Colorado [hereinafter collectively referred to as the "Third Wiretap"]. The suspects named in the Third Wiretap included those named in the Second Wiretap, as well as Guerreros Sanchez–Olivas and Defendant Jaime Olivas–Sanchez. The Third Wiretap terminated October 20, 1994.

### (4) Fourth Wiretap: 94–WT–10 (issued October 7, 1994)

The fourth wiretap order intercepted communications from (303) 477–2721, which is a telephone subscribed to Defendant Ceferino Castillo–Garcia, 3739 Inca Street, Denver, Colorado [hereinafter the "Fourth Wiretap"]. The suspects named in the Fourth Wiretap were: Rosario Portillo–Rodriguez; Defendant Ismael Armendariz–Amaya; Fidela Armendariz, and Defendant Jeffrey Samuel Pino. The Fourth Wiretap terminated October 24, 1994.

### (5) Fifth Wiretap: 94–WT–11 (issued October 21, 1994)

The final wiretap at issue intercepted communications from telephone number (303) 937–1365, subscribed to a "M. Olivas," at 3185 West Alaska Place, Denver, Colorado [hereinafter the "Fifth Wiretap"]. The suspects named in that wiretap were Rosario Portillo–Rodriguez, Defendant Jaime Olivas–Sanchez, and Guerreros Sanchez–Olivas. The Fifth Wiretap terminated October 30, 1994.

### III. THE "NECESSITY" ALLEGATIONS IN THE FIVE WIRETAPS

Detective Barnhill's five affidavits, one for each wiretap, contain a section headed "NECESSITY FOR INTERCEPTION." The

"NECESSITY FOR INTERCEPTION" section of each wiretap is reproduced verbatim in the Appendix to this Memorandum Opinion and Order, because the precise language used in each affidavit is relevant to the analysis undertaken herein and because reference to the affidavits is less cumbersome if they are readily available. Specific reference to the affidavits will hereinafter be made in the legal analysis, and only a few general observations are set forth here.

Each affidavit mentions four "normal investigative procedures" of the type which Congress had in mind in enacting the wiretap statute. (*See* page 12 below for discussion of congressional intent.) These include: (1) visual and/or aural surveillance, (2) interviews with witnesses or subjects, before a grand jury under a grant of immunity if necessary, (3) search warrants, and (4) use of informants and infiltration of a conspiracy by those informants or undercover agents. The affidavits also mention two other "normal investigative procedures": review of police records concerning the subjects of the investigation and analysis of telephone toll records, pen register data, and trap and trace information.[4]

With respect to the "normal investigative procedures" which Congress had in mind in enacting the wiretap statute, the remarkable aspect of the five affidavits is the similarity in their language concerning these normal investigative procedures. Indeed, the materials in the Appendix disclose that entire paragraphs consist of "boilerplate" language which does not vary from one affidavit to the next. The apparent reason for this identity was disclosed at the hearing: subsequent to the investigation which preceded the First Wiretap (and which I have already summarized), the United States never paused to give further renewed consideration to the efficacy of these normal investigative procedures, especially in light of new information disclosed in each successive wiretap, and it never really tried to use any of these procedures. Instead, the investigation proceeded from one wiretap to another. The showing

of "necessity" for the Second through Fifth Wiretaps was accomplished by the use of standard, boilerplate language, much of which could be applied to *any* investigation of a criminal conspiracy, especially one involving controlled substances. Thus, the central legal issue in the case is whether this *modus operandi* complies with the federal wiretap statute.

## CONCLUSIONS OF LAW

### I. GENERAL STATUTORY BACKGROUND

■ Electronic eavesdropping by law enforcement officials is governed by the federal wiretap statute, title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C.A. §§ 2510–2522 (West 1970 & Supp.1995) [hereinafter "title III"]. To assure the privacy of oral and wire communications, title III establishes a three-tiered procedure for obtaining authorization to intercept wire or oral communications. First, a duly-authorized law enforcement officer must obtain approval from the Attorney General of the United States or a specially designated assistant attorney general in order to apply to a federal judge for a wiretap. *See* 18 U.S.C.A. § 2516(1) (West Supp.1995). Second, once such approval is obtained, the officer must present a written application for a wiretap to the judge. Third, the judge must make certain enumerated findings and issue an *ex parte* order containing specified elements. *See* 18 U.S.C.A. § 2518(1), (3)–(4) (West 1970 & Supp.1995). Strict adherence to these procedural steps is a prerequisite to issuance of a wiretap order. *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir.1975).

Each written application presented to the judge must include, *inter alia:*

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to

---

4. A pen register is a device which identifies numbers dialed or transmitted on the telephone line to which such device is attached. A trap and trace device captures incoming impulses which

identify the originating number of an instrument or device from which a wire communication was transmitted. *See* 18 U.S.C.A. § 3127(3)–(4) (West Supp.1995).

the particular offense that has been, is being, or is about to be committed; (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted; (iii) a particular description of the type of communications sought to be intercepted; (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted ...; [and]

(c) *a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.*

18 U.S.C.A. § 2518(1)(b)–(c) (emphasis added).

The findings which the judge must make before he can issue an order are specified in section 2518(3)(a) through (d). Specifically, on the basis of the facts submitted in the application, the judge must determine that:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 ...;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) *normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;*

(d) ... there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

*See* 18 U.S.C.A. § 2518(3)(a)–(d) (emphasis supplied). The underscored language in each of the foregoing statutory quotations embodies a condition for issuance of a wiretap order which is sometimes referred to as the "necessity requirement." It is separate and distinct from the "probable cause" elements contained in the respective sections of the statute.

## II. NECESSITY FOR ELECTRONIC SURVEILLANCE

### A. History and Purpose of the Necessity Requirement

■ The necessity requirement is rooted in the United States Constitution. The constitutional origins of title III's necessity requirement may be traced to the Supreme Court's 1968 decision in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). The Court declared New York's electronic surveillance statute unconstitutional on its face. Among the constitutional deficiencies of New York's statute was its failure to require law enforcement officials to show "exigent circumstances" before obtaining authorization for electronic surveillance. The Court stated:

[T]he statute's procedure, necessarily because its success depends on secrecy, has no requirement for notice as do conventional warrants, nor does it overcome this defect by requiring some showing of special facts. On the contrary, it permits uncontested entry without any showing of exigent circumstances. Such a showing of exigency, in order to avoid notice would appear more important in eavesdropping, with its inherent dangers, than that required when conventional procedures of search and seizure are utilized.

*Id.* at 60, 87 S.Ct. at 1884. *Berger* is premised on a recognition that the stealthy technology represented by wiretapping and electronic eavesdropping poses a greater danger to fourth amendment rights than other searches and seizures. *Id.* at 63, 87 S.Ct. at 1885 ("Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices."). Hence, use of such technology must be supported by something beyond the familiar probable cause standard applied to other searches and seizures.

A year after *Berger* was decided, Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 212 (codified as amended at title III). The legislative history of title III's necessity requirement demonstrates that the necessity requirement embodied in those provisions

was enacted to satisfy *Berger's* "exigent circumstances" requirement. *See* S.Rep. No. 90–1097, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2161–63, 2190–91; *see also United States v. Costello*, 610 F.Supp. 1450, 1464–65 (N.D.Ill.1985) (discussing legislative history of necessity requirement), *aff'd sub nom., United States v. Olson*, 830 F.2d 195 (7th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 708, 98 L.Ed.2d 658 (1988). As the Supreme Court has declared, "Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *Giordano*, 416 U.S. at 515, 94 S.Ct. at 1826–27; *see also Dalia v. United States*, 441 U.S. 238, 250, 99 S.Ct. 1682, 1689, 60 L.Ed.2d 177 (1979) ("The plain effect of the detailed restrictions of [section] 2518 is to guarantee that wiretapping ... occurs only when there is a genuine need for it and only to the extent that it is needed.").

■ Because of the extraordinary danger they pose, wiretaps are not to be routinely employed in criminal investigations. *See Giordano*, 416 U.S. at 515, 94 S.Ct. at 1827. Rather, under section 2518(1)(c) and (3)(c), the applicant must demonstrate, and the court must find, that "normal investigative procedures" (1) were actually attempted without success, (2) reasonably appear unlikely to succeed, or (3) are too dangerous. *See* 18 U.S.C.A. § 2518(1)(c) and (3)(c). Congress intended *normal investigative procedures* to include: (1) standard visual or aural surveillance; (2) general questioning or interrogation under an immunity grant; (3) use of regular search warrants; and (4) the infiltration of conspiratorial groups by undercover agents or informants. *See* 1968 U.S.C.C.A.N. at 2190. Moreover, the Second Circuit recently confirmed what several other circuits have held: "normal investigative procedures" refer to "non-electronic investigative techniques." *See generally United States v. Bianco*, 998 F.2d 1112, 1127 (2d Cir.1993) (citing *United States v. Uribe*, 890 F.2d 554, 556 [1st Cir.1989] [The Government is required to "make a reasonable good faith

effort to run the gamut of normal investigative procedure before resorting to means so intrusive as electronic interception of telephone calls."]; *United States v. Lambert*, 771 F.2d 83, 91 [6th Cir.] ["All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate."], *cert. denied*, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 [1985]) (additional citations omitted), *cert. denied*, —— U.S. ——, 114 S.Ct. 1644, 128 L.Ed.2d 364 (1994).

### B. Application of the Necessity Requirement in This Case

**1. Each of the Five Wiretap Applications and Orders Must Separately Satisfy the Necessity Requirement.**

■ The federal wiretap statute plainly dictates that "*[e]ach* application" include "a full and complete statement" concerning the efficacy of other investigative procedures. *See* 18 U.S.C.A. § 2518(1) (emphasis supplied). Even though the Government may be continuing its investigation of the same conspiracy or broadening its investigation to encompass additional conspiracies or conspirators, successive applications for authority to wiretap additional telephone numbers in the names of different individuals at different locations invade separate and distinct fourth amendment rights and must each be supported by a "full and complete statement" concerning alternate investigative procedures. *Compare United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir.1995) (requiring suppression of evidence, even though same judge had authorized all wiretaps, where a second "supplemental" wiretap application completely omitted any discussion of necessity requirement, either expressly or by referring to and incorporating prior affidavit) *with United States v. Quintana*, 70 F.3d 1167, 1170 (10th Cir.1995) (involving same investigation as *Mondragon* but allowing evidence obtained as result of a first "supplemental" wiretap application, where subject of investigation had changed telephone numbers and this first "supplemental"

application pertained to new number subscribed in name of same individual at same location); *see also United States v. Abascal,* 564 F.2d 821, 826 (9th Cir.1977) (Government must show that each wiretap separately satisfies the necessity requirement), *cert. denied,* 435 U.S. 942, 953, 98 S.Ct. 1521, 1583, 55 L.Ed.2d 538, 804 (1978). *"Each* wiretap application, standing alone, must satisfy the necessity requirements." *United States v. Carneiro,* 861 F.2d 1171, 1176 (9th Cir.1988) (emphasis in original) (citations omitted);[5] *see also United States v. Sobamowo,* 892 F.2d 90, 93 (D.C.Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990).

## 2. *General Principles Used to Determine Whether Each Wiretap Meets the Necessity Requirement.*

■ A review of the case law concerning the necessity requirement discloses three general principles which guide the court in deciding whether the application for each wiretap here met the requirement. First, as this court has previously recognized, "[t]he necessity requirement must be read in a common sense fashion to effectuate the congressional purpose of granting some investigative discretion." *See United States v. Bennett,* 825 F.Supp. 1512, 1525 (D.Colo.1993) ("The Government's burden of showing that other procedures reasonably appear unlikely to succeed or that they are too dangerous to use is not great.") (citations omitted). The purpose of the necessity requirement is to inform the issuing judge of the difficulties involved with conventional techniques and to ensure that wiretapping does not occur in situations where traditional investigative techniques would suffice. *See United States v. Webster,* 734 F.2d 1048, 1055 (5th Cir.) (courts will not invalidate a wiretap order because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not), *cert.*

denied, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *United States v. Johnson,* 645 F.2d 865, 867 (10th Cir.) (same), *cert. denied,* 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981).

■ A second and related principle which the court must keep in mind in evaluating these wiretaps is that the applicant need not exhaust all normal investigative techniques before resorting to the wiretap. The statute merely requires that the application contain a full and complete statement as to (1) whether other investigative procedures have been tried and failed or (2) why they *reasonably appear* to be unlikely to succeed if tried or (3) why they are too dangerous. *See United States v. Torres,* 908 F.2d 1417, 1422 (9th Cir.), *cert. denied,* 498 U.S. 905, 948, 111 S.Ct. 272, 366, 112 L.Ed.2d 228, 329 (1990); *United States v. Brown,* 761 F.2d 1272, 1275 (9th Cir.1985); *United States v. Martinez,* 588 F.2d 1227, 1231 (9th Cir.1978) (same); *United States v. Pezzino,* 535 F.2d 483, 484 (9th Cir.) (*per curiam*) (the necessity requirement can be satisfied even though police fail to use one type of normal investigative technique), *cert. denied,* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 106 (1976). Furthermore, as Congress noted, "[m]erely because a normal investigative technique is theoretically possible, it does not follow that it is likely." *See* 1968 U.S.C.C.A.N. at 2190.

■ A third principle useful in evaluating the wiretaps at issue here is the notion that the applicant must allege *"specific circumstances* that render normal investigative techniques particularly ineffective." *United States v. Ippolito,* 774 F.2d 1482, 1486 (9th Cir.1985) (emphasis supplied). The applicant must demonstrate "with specificity why in *this particular investigation* ordinary means of investigation will fail." *United States v. Robinson,* 698 F.2d 448, 453 (D.C.Cir.1983) (emphasis in original); *see also Simpson,* 813

---

**5.** The Fifth Circuit declined to adopt the *Carneiro* court's reasoning to the extent it could be interpreted to dilute the standard for validating an intercept based upon an allegedly false affidavit as addressed by the Supreme Court in *Franks v. Delaware,* 438 U.S. 154, 164, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978). *See United States v. Guerra–Marez,* 928 F.2d 665, 670 n. 4 (5th Cir.) (rejecting standard based upon whether a rea-

sonable district court judge *could have* denied a wiretap application), *cert. denied,* 502 U.S. 917, 969, 112 S.Ct. 322, 443, 116 L.Ed.2d 263, 461 (1991). Defendants have not requested a *Franks* analysis in this case, and they do not rely upon alleged falsehoods as a basis for suppressing evidence obtained as a result of the wiretaps. I therefore need not address any *Franks* issues in this case.

F.2d at 1472; *Kalustian,* 529 F.2d at 589; *Costello,* 610 F.Supp. at 1467. "The reason for requiring specificity is to prevent the government from making general allegations about classes of cases and thereby sidestepping the requirement that there be necessity in the particular investigation in which a wiretap is sought." *Ippolito,* 774 F.2d at 1486. While a wiretap *may* be appropriate to determine the members and scope of a drug conspiracy, *see United States v. Newman,* 733 F.2d 1395, 1399 (10th Cir.1984); *Johnson,* 645 F.2d at 867, courts must be careful "not to permit the government merely to characterize a case as a 'drug conspiracy' or a 'fencing conspiracy' that is therefore inherently difficult to investigate," *Robinson,* 698 F.2d at 453; *see also United States v. Brone,* 792 F.2d 1504, 1507 (9th Cir.1986) ("The government may not dispense with the statutory mandated showing of necessity to obtain a wiretap [of one conspirator's] telephone despite the validity of the wiretap of his co-conspirator's telephone."); *Abascal,* 564 F.2d at 826 (Government must do more than show that the telephone subscribers they wish to tap are part of one conspiracy) (additional citations omitted). Thus, "boilerplate recitation of the difficulties of gathering usable evidence" in a class of cases is not a sufficient basis for issuing a wiretap order. To hold otherwise would make the necessity requirements "mere formalities" in such cases. *United States v. Kerrigan,* 514 F.2d 35, 38 (9th Cir.) *(dictum )* (bookmaking conspiracy), *cert. denied,* 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975); *see United States v. Leavis,* 853 F.2d 215, 220 (4th Cir. 1988) (quoting *Kerrigan* in a drug conspiracy); *United States v. McKinney,* 785 F.Supp. 1214, 1220 (D.Md.1992) (quoting *Leavis* and *Kerrigan*); *see also Carneiro,* 861 F.2d at 1180 (noting, in the course of suppressing evidence obtained in a second wiretap, that agent's affidavit submitted in support of wiretap "appears to be a word processor copy of the allegations he set forth" in application for previous wiretap).

### 3. *Application of General Principles to Each of the Five Wiretaps at Issue.*

■ The First Wiretap application satisfies section 2518(1)(c) and (3)(c). The Government adequately considered other investigative means before making its wiretap application. *Cf. Ippolito,* 774 F.2d at 1486 (the Government must attempt to use traditional methods that "easily suggest themselves and are potentially productive" before seeking a wiretap order). Although the affidavit submitted in support of the application contains certain standard, boilerplate language which might arguably be applicable to any drug conspiracy investigation, the Government supplemented that general language with detailed recitals demonstrating why normal investigative tools were not feasible in the specific case under investigation. *Cf. United States v. Kail,* 612 F.2d 443, 447 (9th Cir.1979) (affidavit adequately demonstrated necessity because it provided sufficiently particularized detail to establish the need for a wiretap in spite of some success with normal investigative techniques), *cert. denied,* 446 U.S. 912, 953, 100 S.Ct. 1842, 2920, 64 L.Ed.2d 266, 810 (1980).

Specifically, Detective Barnhill's affidavit in support of the First Wiretap discussed particular problems which the Government had encountered in employing (1) confidential informers, (2) undercover law enforcement officers, and (3) physical or aural surveillance. CW–1, the only "cooperating witness" supplying information at the time the application for the First Wiretap was made, had purchased more than twenty kilograms of cocaine from Rosario Portillo–Rodriguez during the preceding year, yet he had never been introduced to Portillo–Rodriguez's supplier. (*See* 94–WT–4, Application for Interception of Electronic and Wire Communications, Attach. C [Barnhill Aff. ¶ 35], [filed Aug. 19, 1994] [hereinafter "First Wiretap Affidavit"], *reproduced in part* at App.) Therefore, the affidavit asserts, "[t]he use of undercover law enforcement personnel is not practical in this case[,]" and "[i]t is highly unlikely that an undercover law enforcement officer would be any more effective in such an endeavor." (*Id.*) Indeed, CW–1 did not know the identity of other persons who sold cocaine for Rosario Portillo–Rodriguez. (*Id.* ¶ 36.)

Concerning surveillance, Detective Barnhill's affidavit supplements certain generic

statements applicable to any type of surveillance, (*id.* ¶¶ 39a, 39d), with a particularized, lengthy statement regarding the limited success of surveillance at or near Rosario Portillo–Rodriguez's residence on Raritan Street as a result of (1) "the curving nature of the street," (2) "the residential make up of the neighborhood," (3) "piqued" interest of residents in the neighborhood during prior surveillance attempts, and (4) the fact that surveillance on a garage associated with several relevant drug transactions could not "be effectively conducted due to its secluded location," (*id.* ¶ 39b). Surveillance was also impractical, according to the affidavit, because Rosario Portillo–Rodriguez (1) frequented construction sites located in remote locations with limited traffic access and (2) had access to numerous vehicles as a result of his connection with construction work, (*id.* ¶ 39c).

It is true that the First Wiretap application contains generic boilerplate paragraphs concerning some other investigative techniques. Interviews with witnesses and/or subjects were likely to be unproductive, the affidavit states, because (1) no single person was familiar with the entire conspiracy, (2) the interviewees would likely fear reprisals, and (3) word of such interviews might cause some subjects of the investigation (many of whom had strong ties with the Republic of Mexico) to flee from the United States. (*Id.* ¶ 37.) Use of the grand jury's power to subpoena witnesses would, according to the affidavit, give rise to additional problems: (1) such witnesses might invoke their fifth amendment privilege not to testify; and (2) culpable persons might receive grants of immunity which would make prosecution difficult. The affidavit contains similar statements relating to telephone toll records, pen registers, trap and trace data, police records, and search warrants. (*Id.* ¶¶ 40–42.)

Although these general assertions, standing alone, would arguably violate the principle that the wiretap applicant must show necessity for the wiretap *in the particular case at hand,* such assertions, *accompanied by the specific and particularized informa-*

*tion* which I have already described, are sufficient to justify the First Wiretap. *See Simpson,* 813 F.2d at 1472 ("The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail.") (quoting *Ippolito,* 774 F.2d at 1486) (additional citation omitted); *see also Kalustian,* 529 F.2d at 590 (wiretap application must demonstrate why normal investigative procedures are insufficient in a *particular* case). Considering the application as a whole and giving it a reasonable, common-sense reading, *see Bennett,* 825 F.Supp. at 1525, the Government adequately demonstrated that it had seriously considered the viability of alternate investigative techniques and that the wiretap was necessary. The factual background included in the affidavit in support of the First Wiretap details the Government's use of an informant, the informant's limited knowledge about the scope of the conspiracy, surveillance efforts, photo identifications, and numerous other details regarding normal investigative techniques which the Government attempted prior to applying for the First Wiretap. (First Wiretap Affidavit at 11–47.) I therefore conclude that the Government sought permission for the First Wiretap only when normal methods of investigation proved ineffective in revealing defendants' source of controlled substances and the scope of the alleged drug operation. Accordingly, the Government satisfied the necessity requirement with respect to the First Wiretap.

The applications for the Second through Fifth Wiretaps are largely boilerplate clones of one another and stand in stark contrast to the specificity disclosed in the First Wiretap application. Gone are the First Wiretap application's detailed disclosures concerning (1) the physical difficulties involved with surveillance at subjects' residences or other locations involved in the investigation, (2) the remoteness and isolation of the locations where drug transactions occurred, or (3) the use of multiple vehicles by any subject in the investigation. (*See* First Wiretap Affidavit ¶¶ 39b, 39c.) [6] Nor is there any other at-

---

**6.** It is true that the Second through Fifth Wiretaps applications attach and incorporate by reference the First Wiretap Affidavit. The sufficient,

particularized allegations in the First Wiretap Affidavit, however, pertain to the problematic surveillance of the two Raritan Street residences

tempt at specificity. Instead, the assertions regarding surveillance in the Second through Fifth Wiretap applications consist of three unvarying paragraphs containing allegations which would be true of surveillance *in any type of investigation.* Detective Barnhill asserts that surveillance is inadequate because it requires that activity be monitored on a twenty-four-hour basis and could be conducted for only a brief period of time without being discovered. (*E.g.,* 94–WT–7, Application for Interception of Wire Communications, Attach. B [Barnhill Aff. ¶ 34a] [filed Sept. 22, 1994] [hereinafter, "Second Wiretap Affidavit"], *reproduced in part at* App.) Second, in a sentence of unclear meaning, Detective Barnhill states, "[i]n your affiant's experience, surveillance of these individuals has been successful only to a limited degree, in that prior knowledge of the subjects' activities enabled surveillance officers to observe meetings at known locations." (*Id.* ¶ 34b.) Finally, Detective Barnhill notes that surveillance, if successful, demonstrates only the meeting of two subjects which, standing alone, does not reveal the nature or purpose of their meeting. (*Id.* ¶ 34c.) This language is repeated, verbatim, in every subsequent wiretap application except for the one supporting the Third Wiretap; the application for the Third Wiretap even omits some of this barebones language.

The only arguable attempt at particularization in the surveillance sections of the Second through Fifth Wiretap applications is an assertion, repeated verbatim in each application, that Ceferino Castillo–Garcia had "detected surveillance on at least one occasion." (*E.g., id.* ¶ 34a.) The assertion is based on two conversations between Rosario Portillo–Rodriguez and Ceferino Castillo–Garcia overheard during the First Wiretap. On the evening of September 5, 1994, Ceferino told

Rosario that he "saw them watching." (*Id.* ¶ 23b.) The next day he told Rosario that he intended to drive to Rosario's location "to see if he ... would be followed." (*Id.* ¶ 24a.) This circumstance does not materially affect my necessity analysis. Even if one could properly infer that Ceferino had "detected surveillance," it does not follow that surveillance of other subjects and locations would be ineffective—especially in light of the fact that neither Ceferino nor any other subject is claimed to have attempted evasion of the limited surveillance which did occur during the investigation. In contrast to the First Wiretap Affidavit, there is also no claim in the Second through Fifth Wiretap applications concerning circumstances which made surveillance unusually difficult.

The Second through Fifth Wiretap applications also fail to demonstrate that the normal investigative technique of using informers and/or undercover law officers to infiltrate the organization "reasonably appear[s] to be unlikely to succeed if tried." The limited usefulness of CW–1 discussed in the First Wiretap application applies equally, of course, to all subsequent applications. By the time it applied for the Second Wiretap on September 22, 1994, however, the Government had located a second informant, identified only as "CW–2." [7] CW–2 had furnished information to the Federal Bureau of Investigation for "approximately one year." (Second Wiretap Affidavit ¶ 18.) The information furnished by CW–2 was based partly on his personal observations of Defendant Ceferino Castillo–Garcia and partly on information given CW–2 by "associates of" Castillo–Garcia. (*Id.*) Although Detective Barnhill's affidavits do not expressly state whether CW–2 ever dealt in controlled substances with Castillo–Garcia or anyone else in the organiza-

mentioned therein and of Rosario Portillo–Rodriguez. The later incorporation by reference of these allegations does not save the Second through Fifth Wiretaps, because the allegations do not pertain to surveillance of other subjects or locations which were discovered as the investigation broadened.

7. The documentation furnished to obtain the Third Wiretap discusses an informer identified as "CS [Confidential Source]–1." (94–WT–8, Application for Interception of Wire Communications,

Attach. Two [Barnhill Aff. ¶ 17], [filed Sept. 22, 1994] [hereinafter "Third Wiretap Affidavit"], *reproduced in part at* App.) While the different appellation might at first glance suggest the presence of yet a third informer in the investigation, a comparison of the respective affidavits reveals that the paragraphs concerning CS–1 and CW–2 are *identical. Compare* Second Wiretap Affidavit ¶¶ 18–20, 22b *with* Third Wiretap Affidavit ¶¶ 17–18, 20, 22a. I thus infer that CS–1 and CW–2 are the same person.

tion, CW–2 did demonstrate intimate knowledge of the organization, its members, and its illegal activities. (*See id.* ¶¶ 18–20, 22b.) It is therefore reasonable to infer that CW–2 was either a member of the conspiracy or, at the very least, a person in whom the conspirators had enough trust and confidence that they made no attempt to conceal their illegal activities from him.

The Government proffered two reasons why further use of CW–2 would be unfruitful. First, it said, CW–2 had "indicated a reluctance to testify in any proceeding" out of fear for CW–2's personal safety or that of CW–2's family. (Second Wiretap Affidavit ¶ 33.) Second, it asserted, CW–2 was furnishing information concerning unrelated criminal activities and would be compromised were CW–2 identified in this case. (*Id.*) These proffered reasons, however, side-step the important issue of whether CW–2 might be used to introduce undercover law enforcement agents to one or more of the conspirators, thus permitting the agents to infiltrate the organization and/or make controlled purchases from Ceferino Castillo–Garcia or other conspirators. Given that CW–2 was either a conspirator or a trusted associate, it reasonably appears that CW–2 could have made such introductions without becoming a witness or compromising CW–2 in unrelated investigations concerning different persons. The Government proffered no other reason supporting an inference that use of undercover officers would not be feasible. The Government's discussion of CW–2 thus falls short of demonstrating why use of informers and/or undercover agents "reasonably appear[s] unlikely to succeed if tried."

Finally, I conclude, the Government has failed to demonstrate that the normal investigative technique of obtaining search warrants "reasonably appear[ed] to be unlikely to succeed if tried." In the documentation submitted to obtain the Second and Third Wiretaps on September 22, 1994, the Government expressly and correctly recognized that it possessed ample information to obtain search warrants for Rosario Portillo–Rodriguez's two residences on Raritan Street. (*E.g.*, Second Wiretap Affidavit ¶ 31.) The Government also expressly and correctly rec-

ognized that it possessed ample information to arrest and prosecute four of the named defendants in this case (Apolonio Portillo–Rodriguez, Ceferino Castillo–Garcia, Jaime Olivas–Sanchez, and Ismael Armendariz–Amaya), as well as other conspirators who were not indicted (including Rosario Portillo–Rodriguez). (*See* First Wiretap Affidavit ¶ 35; Second Wiretap Affidavit ¶ 31; Third Wiretap Affidavit ¶¶ 30, 31.) It could therefore have arrested and then searched these persons instead of applying for wiretaps.

To support its contention that execution of search warrants would be unlikely to succeed if tried, the Government in the Second through Fifth wiretap applications used identical, boilerplate language based on Detective Barnhill's general experience and that of unidentified investigators in other enumerated state and federal law enforcement agencies. (*E.g.* Second Wiretap Affidavit ¶ 39.) Use of such conclusory allegations based on the general experience of an agent has been rejected. In *Kalustian,* for example, the Ninth Circuit wrote:

[The investigating officials] discarded alternative means of further investigation because "knowledge and experience" in investigating other gambling cases convinced them that "normal investigative procedures" were unlikely to succeed. [The affiant supporting the wiretap application] recites that searches are often fruitless because gamblers keep no records, destroy them, or maintain them in undecipherable codes....

The affidavit does not enlighten us as to why this gambling case presented any investigative problems which were distinguishable in nature or degree from any other gambling case. In effect the Government's position is that all gambling conspiracies are tough to crack, so the Government need show only the probability that illegal gambling is afoot to justify electronic surveillance. Title III does not support that view.

*Kalustian,* 529 F.2d at 589; *see also United States v. Lilla,* 699 F.2d 99, 104 (2d Cir.1983) ("we reject generalized and conclusory statements that other investigative procedures would prove unsuccessful"); *In re DeMonte,*

674 F.2d 1169, 1174 (7th Cir.1982) (same); *Costello,* 610 F.Supp. at 1467 (*dictum* ).

More importantly, the general boilerplate recitations concerning the shortcomings of search warrants contradict other particular information disclosed by the investigation. According to Detective Barnhill's various affidavits, the principal problem with search warrants is that evidence obtained in executing the warrants would not enable the investigators "to determine the full scope of the alleged criminal activity, the identity of others involved in the criminal enterprise and their particular roles." (*E.g.,* Second Wiretap Affidavit ¶ 39.) The reason for this, the affidavits continue, is that there "appears no reason at present to assume" that the conspirators maintain uncoded written information in enough detail to identify the participants in the cocaine distribution business. (*E.g., id.*) This boilerplate claim, however, ignores (and tends to contradict) specific information suggesting that Rosario Portillo–Rodriguez did maintain records concerning his sales of cocaine. CW–1 told Detective Barnhill that Rosario Portillo–Rodriguez maintained "a record of his drug customers and outstanding debts in a small notebook." (First Wiretap Affidavit ¶ 10f.) During a meeting between CW–1 and Rosario Portillo–Rodriguez on August 1, 1994 (monitored and recorded by law enforcement agents), CW–1 asked to see the written record of his debt to Portillo–Rodriguez for past deliveries of cocaine on consignment. Portillo–Rodriguez produced a small black notebook from his shirt pocket, and CW–1 initialed an entry next to his name which indicated a debt of $26,950. (*Id.* ¶ 29e.) Again, on August 4, 1994, the two men calculated CW–1's debt, and CW–1 placed his initials next to his name. (*Id.* ¶ 31n.) It is reasonable to infer from the affidavit that the small black notebook was a record containing at least the names of persons to whom Rosario Portillo–Rodriguez had sold cocaine, together with the amount owed by the customer and the customer's initialed acknowledgment of the debt. A search of Rosario Portillo–Rodriguez's residences or his person would therefore have revealed much of what the Government claimed would not be revealed by a search warrant.

The primary reason for the lack of particularization in the affidavits supporting the Second through Fifth Wiretaps became apparent when Detective Barnhill testified at the hearing on various defendants' motions to suppress: after obtaining the First Wiretap, the Government undertook no "normal investigation procedures" before seeking any of the subsequent wiretaps. During cross-examination of Detective Barnhill, defense counsel asked, "You never attempted normal investigative techniques after August 19, when you made your first wire application, correct?" Detective Barnhill responded, "Yes. I guess so. I don't know what other investigative techniques we could have used." Defendant's counsel later returned to that line of questioning by asking Detective Barnhill, "Between the taps on wiretap four [the first wiretap] and wiretap ten [the fourth wiretap], you undertook no alternative investigatory steps, other than the wiretaps, correct?" Detective Barnhill responded, "That's correct." The detective immediately stated, however, that he might have misspoken because the Government initiated wiretap seven between wiretap four and wiretap ten.[8] As previously noted, intervening wiretaps do not constitute "normal investigative techniques" for the purpose of title III. *See, e.g., Bianco,* 998 F.2d at 1127.

█ With respect to the Second through Fifth Wiretaps, I conclude that the Government failed to use normal investigative procedures, or to establish—*based on the particular circumstances of each interception sought*—that such procedures reasonably appeared unlikely to succeed. Although it appears that the Government continued to run criminal background checks on suspects and to use pen registers or trap and trace devices on the calls made from each intercepted number (in order to show that the additional target telephones were used in negotiating drug transactions), such routine efforts do

---

8. The numeric references in this exchange are to the clerk's docket number assigned to the appli- cations.

not rise to the level of "normal investigative procedures" required by title III, its legislative history, and relevant case law. It is evident the Government's approach here was to move swiftly from wiretap to wiretap, without pausing to consider whether normal investigative procedures could be used effectively, particularly in light of any evidence obtained as a result of each succeeding wiretap. The Government sought each succeeding wiretap solely because defendants were suspected to be members of the conspiracy under investigation. Such suspicion, while it may satisfy the probable cause element of the wiretap statute, is an insufficient basis for a wiretap. *See Carneiro*, 861 F.2d at 1181. If the Constitution and the statutory procedures of title III are to have any real meaning as to the Second through Fifth Wiretaps, the Government must be held to a standard above that which is revealed by the facts of this case. Because the Second through Fifth Wiretaps (and extensions thereof) do not meet the necessity requirement, evidence obtained as a result of those wiretaps is "fruit of the poisonous tree," and must be suppressed. *See United States v. Spagnuolo*, 549 F.2d 705, 711–12 (9th Cir. 1977) (recognizing codification of fruit of poisonous tree doctrine in title III).

## III. MINIMIZATION OF INTERCEPTED COMMUNICATIONS

### A. *Burden of Proof*

■ Minimization is required by section 2518(5), which provides that "every order and extension thereof ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C.A. § 2518(5). Section 2518(5) does not require that all innocent conversations be left untouched. "It merely provides that unnecessary intrusions be minimized, or reduced to the smallest degree possible." *United States v. Clerkley*, 556 F.2d 709, 715 (4th Cir.1977), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978). In order to determine whether the Government properly minimized interception of conversations, a test of reasonableness is applied to the particular facts of each case. *Scott v. United States*, 436 U.S. 128, 139–40,

98 S.Ct. 1717, 1724–25, 56 L.Ed.2d 168 (1978).

■ The Government has the burden to show proper minimization. *See Torres*, 908 F.2d at 1423 (citing *United States v. Rizzo*, 491 F.2d 215 [2d Cir.], *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 [1974]); *United States v. Willis*, 890 F.2d 1099, 1102 (10th Cir.1989). Minimization only requires the Government agents to exercise good faith, reasonable efforts to minimize the extent of those intrusions. Where a good faith reasonable effort has been made, interception is valid even though some nonpertinent calls are monitored. *See United States v. Falcone*, 364 F.Supp. 877, 885 (D.N.J.1973), *aff'd*, 500 F.2d 1401 (3d Cir. 1974). Once the Government has made a *prima facie* showing of reasonable minimization, the burden shifts to defendants to show how more effective minimization could have taken place. *Willis*, 890 F.2d at 1102.

■ An evidentiary hearing on a motion to suppress ordinarily is only required if "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir.1979) (concerning defendant's request for hearing on minimization), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980). Whether an evidentiary hearing is appropriate rests on the reasoned discretion of the district court. *Id.* (denying request for hearing where no specific allegations raised contested issues of fact); *see also United States v. Losing*, 539 F.2d 1174, 1177–78 (8th Cir.1976), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977).

A hearing is unnecessary for me to conclude that the Government complied with statutory minimization requirements in this case. *See United States v. Giacalone*, 853 F.2d 470, 481–83 (6th Cir.) (affirming denial of evidentiary hearing where defendants failed to give any specific examples of conversations which should not have been monitored) ("defendant must make at least some initial showing of contested facts to be enti-

tled to [an evidentiary] hearing"), *cert. denied*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). Defendants' request for an evidentiary hearing on the minimization issue is denied based upon their failure to present evidence sufficient to warrant an evidentiary hearing.

### B. Application of the Minimization Requirement

 Given the suppression of evidence obtained from all wiretaps, except the First Wiretap, this minimization analysis is limited to communications intercepted as a result of that wiretap. The factors to be considered in determining whether minimization was reasonable in this case are: (1) the nature and scope of the criminal enterprise under investigation; (2) the Government's reasonable inference of the character of a conversation from the identity of the parties to the conversation; and (3) the extent of judicial supervision. *United States v. Armocida*, 515 F.2d 29, 44–45 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978).

 Where the Government is investigating a widespread conspiracy, as it was here, it is appropriate for monitoring agents to monitor calls more extensively than might have been appropriate in a simpler case. *Hyde*, 574 F.2d at 869. Moreover, where the suspects use a specialized code or jargon, a greater degree of monitoring is permissible. *See, e.g., United States v. James*, 494 F.2d 1007, 1019 (D.C.Cir.), *cert. denied*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); *Armocida*, 515 F.2d at 44; *United States v. Cantu*, 625 F.Supp. 656, 675 (N.D.Fla.1985), *aff'd*, 791 F.2d 940 (11th Cir.1986). If an "intercepted communication is in a ... foreign language, and an expert in that foreign language ... is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception." 18 U.S.C.A. § 2518(5) (West Supp.1995). "After-the-fact" minimization must also be performed reasonably. *See United States v. David*, 940 F.2d 722, 730 (1st Cir.), *cert. denied*, 502 U.S. 989, 112 S.Ct. 605, 116 L.Ed.2d 628 (1991). "The key

to after-the-fact minimization is that the process utilized must protect the suspect's privacy interests to approximately the same extent as would contemporaneous minimization, properly conducted." *Id.* (citation omitted) (minimization reasonable where interpreters were told to stop listening to a tape once they determined that the conversation was beyond the scope of the investigation).

 Defendants argue that, to the extent the intercepted conversations were in Spanish, minimization was not accomplished as soon as practicable after the interception. They rely upon *United States v. Cale*, 508 F.Supp. 1038, 1041 (S.D.N.Y.1981) (order reasonably permitted total reception of conversations until a translator of the foreign tongue became available). Defendants also contend that the Government did not comply with statutory minimization requirements because a Spanish-speaking interpreter was not always present during the intercepted conversations.

Contrary to defendants' contentions, Detective Barnhill testified that a Spanish-speaking monitor was utilized and present during all intercepted communications on the First Wiretap. Minimization was therefore contemporaneous with the interceptions. Detective Barnhill relied upon Spanish-speaking monitors who had been recommended by various federal agencies and with whom he or the agencies had experience. Additionally, Detective Barnhill testified that the Government avoided intercepting non-pertinent telephone calls and that most interceptions lasted less then two minutes. Defendants presented no evidence to the contrary. Accordingly, their contention regarding after-the-fact minimization has no basis in fact.

 The United States also presented a detailed letter from an Assistant United States Attorney outlining minimization requirements for Detective Barnhill and a Federal Bureau of Investigation special agent working on the case. (*See* Government's Ex. 2.) Detective Barnhill testified that he and his monitors complied with the requirements set forth in that letter. Furthermore, I take judicial notice of the progress reports con-

tained in the court's file regarding the First Wiretap, and upon review of those reports conclude that reasonable efforts were made to comply with the minimization requirements of section 2518(5). The record also shows that the court closely supervised the electronic surveillance through the use of progress reports. I conclude that the Government has met its *prima facie* burden.

Despite ample opportunity to review logs of the monitored and transcribed conversations and compare them with the tape-recorded interceptions, defendants have made no attempt to dispute the Government's *prima facie* case. There is no evidence that the Government abused a target's privacy or that conversations overheard were not pertinent. Nor have defendants suggested how further minimization of innocent conversations could have been achieved. Although defendants argue that more effective minimization could have taken place, they present no evidence to support their contention, nor do they cite specific examples of the Government's failure to minimize. There is no indication that any error occurred in translation or in a monitor's judgment with respect to minimization of Spanish-speaking conversations. Accordingly, I find the Government made reasonable efforts to minimize the intrusions associated with the First Wiretap. Thus, the overall minimization requirement of title III was met. *See United States v. Cox,* 567 F.2d 930, 933 (10th Cir.1977) ("Courts should avoid adopting an overly restrictive interpretation of the minimization requirement which makes it impossible to use this device in connection with the investigation of organized criminal conspiracies."), *cert. denied,* 435 U.S. 927, 98 S.Ct. 1496, 55 L.Ed.2d 522 (1978). Defendants' motion to suppress is therefore denied to the extent they rely upon allegations of improper minimization.

## IV. CONCLUSION

Upon the foregoing findings and conclusions, it is

ORDERED as follows:

1. Defendants' various motions (see footnote 2) to suppress intercepted communications are GRANTED in part and DENIED in part. Defendants' motions are GRANTED with respect to 94–WT–7 (and extensions thereof), 94–WT–8, 94–WT–10, and 94–WT–11. Defendants' motions are DENIED with respect to 94–WT–4.

2. All pending motions to declare the case complex are DENIED as moot. The complexity of the case was addressed in this court's "Memorandum of Pretrial Conference and Order Concerning Speedy Trial Act." Accordingly, Defendant Bujanda–Ibarra's motion to vacate that conference, filed March 21, 1995, is also DENIED as moot. All pending motions for an extension of time to file more motions are DENIED for failure to show good cause, defendants having been given ample time to file all motions.

3. The court will hold a status conference in the case on Wednesday, April 10, 1996, at 8:30 o'clock a.m.

### APPENDIX *

**First Wiretap**

**94–WT–4 (8/19/94)**

NEED FOR INTERCEPTION:

34. Your affiant is aware that a number of normal and routine investigative techniques are available for the investigation of matters involving the possession and distribution of controlled substances. These techniques are frequently used in conjunction with one another and include confidential sources (such as Cooperating Witnesses), interviews with witnesses, interviews of subjects, calling witnesses before the Federal Grand Jury, surveillances, analysis of long distance toll records, pen register data and trap and trace information, reviewing police records, use of undercover law enforcement personnel, and search warrants.

35. Some of these normal investigative procedures have been tried and have been successful to a limited extent to produce evidence to prosecute ROSARIO PORTILLO, JOSE PORTILLO–RODRIGUEZ,

---

* *There are no footnotes in any of the five wiretap applications. All footnotes have been added by* *the court to explain certain references in this Appendix.*

BAUDELIO PORTILLO–RODRIGUEZ, APOLONIO PORTILLO–RODRIGUEZ and JAMES SCOTT SEDGLEY. However, these techniques have failed to date, to identify the source of supply of the cocaine, the identity of all other co-conspirators, the method and means utilized by the criminal enterprise to conceal their drug proceeds, and the full scope of this conspiracy. The use of undercover law enforcement personnel is not practical in this case. The CW has purchased over 20 kilograms of cocaine during the past year from ROSARIO PORTILLO, and the CW has yet to be introduced to the supplier of ROSARIO PORTILLO's cocaine. It is highly unlikely that an undercover law enforcement officer would be any more effective in such an endeavor.

36. The CW in this investigation deals directly with ROSARIO PORTILLO, and would be of no further use in investigating the other members of this drug distribution network or their activities. Also, no other confidential source(s) and/or witness(es) are known to exist at this time.

37. Based on your affiant's experience, your affiant believes that interviews are not likely to be successful in this instance for developing sufficient evidence for the prosecution because the only persons with knowledge of the entire scope of the criminal activity are the participants themselves. To date, no witness with any knowledge of the full scope of the cocaine importation and distribution network has been identified. Interviews with persons involved in the distribution of controlled substances are not normally productive because those individuals fear reprisals by their confederates or are reluctant to cooperate because of their own culpability. Additionally, interviews and attempts to develop witnesses would serve to alert the targets of the investigation, cause them to become more cautious, and perhaps prompt them to flee the jurisdiction to avoid further investigation or possible prosecution, since many of the subjects involved in this cocaine distribution enterprise have strong ties to the Republic of Mexico. In this investigation, due to the family relationship existing between several of the targets of this investigation, it is extremely unlikely that any of the knowledgeable persons involved with this organization would be willing to identify or testify against the other members of this organization.

38. The possibility of initiation of a Federal Grand Jury investigation into the illegal activities of the subjects has been discussed with attorneys assigned to the MOUNTAIN STATES DRUG TASK FORCE. Your affiant was advised that if called to testify, the subjects would likely invoke their Fifth Amendment privileges, and furthermore, that it would be unwise to seek Grand Jury immunity for any of the subjects named herein because it might foreclose prosecution of culpable individuals. In addition, witnesses called to testify before the Grand Jury cannot be prevented from notifying other members of this organization of the existence of this investigation. Such notification could result in the destruction of evidence, intimidation of witnesses, and flight by targets of the investigation to avoid prosecution.

39. a. Surveillance of ROSARIO PORTILLO, JOSE PORTILLO–RODRIGUEZ, BAUDELIO PORTILLO–RODRIGUEZ, APOLONIO PORTILLO–RODRIGUEZ and JAMES SCOTT SEDGLEY and others designed to identify all of their distributors would require that their activities be monitored on a 24–hour basis. It is unlikely that such a surveillance operation could be conducted for more than a brief period of time before it was discovered, possibly placing the entire investigation in jeopardy. On several occasions during this investigation, ROSARIO PORTILLO has shown concern regarding law enforcement surveillance of his activities.

b. In your affiant's experience, surveillance of this individual has been successful only to a limited degree, in that prior knowledge of the subject's activities enabled surveillance officers to observe meetings at known locations. Physical surveillance of 4500 Raritan Street is difficult due to the curving nature of the street and the residential make up of the neighborhood. During the course of surveillances in that area, it is obvious that the presence of law enforcement personnel has piqued the interest of the residents. Talk between and among neighbors

regarding the strange vehicles and drivers in their neighborhood could make its to the targets of the investigation. Surveillance of the garage at the rear of 4331 Raritan Street (which has been the site of many of the drug transactions described in this affidavit) cannot be effectively conducted due to its secluded location.

c. Since the inception of this investigation, ROSARIO PORTILLO has frequented numerous construction sites in the Denver, Colorado area. Many of these sites are remote in location, and traffic access has sometimes been limited to only those individuals engaged in construction activities. Such locations severely limit law enforcement's ability to maintain an effective covert surveillance of the subject's activities and movements. Due to the nature of ROSARIO PORTILLO's occupation as a cement contractor, he has access to numerous vehicles. The Colorado Department of Motor Vehicles records indicated that ROSARIO PORTILLO has nine (9) vehicles registered in his name. It is therefore difficult to initiate or maintain surveillance based upon the expectation that ROSARIO PORTILLO would utilize any one particular vehicle.

d. In addition, surveillance, if successful, only demonstrates that two subjects met and does not reveal the nature or purpose of their meeting. Surveillance, conducted in conjunction with the interception of wire and electronic communications sought herein, may further define the purpose of such meetings.

40. Your affiant has obtained and analyzed telephone toll records, dialed number recorder (pen register) data and trap and trace information for telephones known to be available to the subjects of this investigation. This information provides only circumstantial evidence that the telephone was used. Telephone toll records, pen register and trap and trace data do not identify the individuals making or receiving wire communications, nor do they disclose the nature or purpose of those communications. Additionally, telephone toll records, pen register data and trap and trace data provide no information regarding the identity of the individuals placing the call, and are generally untimely and preclude the possibility of essential physical surveillance. Though individuals with criminal histories and controlled substance violations have been identified through this information, their specific relationship to ROSARIO PORTILLO and the other individuals identified herein is presently unknown.

41. Your affiant has reviewed police records of individuals suspected of being implicated in-the illegal activities alleged herein. Police records reflect only that subjects have been arrested and/or convicted for their past criminal activity. These records reveal nothing concerning the details or extent of the alleged ongoing criminal activity.

42. Based upon the personal experience of the affiant and experience of investigators from the FEDERAL BUREAU OF INVESTIGATION, DENVER POLICE DEPARTMENT, IMMIGRATION and NATURALIZATION SERVICE, INTERNAL REVENUE SERVICE and BUREAU OF ALCOHOL, TOBACCO and FIREARMS, your affiant believes that the execution of search warrants would not develop sufficient evidence necessary to determine the full scope of the alleged criminal activity, the identity of others involved in the criminal enterprise and their particular roles. There appears no reason at present to assume that these individuals maintain uncoded written information in such detail that it would completely identify the extent of and all the participants involved in their cocaine distribution organization. Although it is believed that search warrants could provide valuable information to assist in this investigation, it is doubtful that search warrants alone could lead to the identification and prosecution of all of the members of this organization. It is, however, anticipated that at a later stage in this investigation, search warrants will be requested for several locations believed to be used by the targets of this investigation for storing controlled substances.

43. Based on the information contained herein, as well as additional information provided by the CW, it is apparent that ROSARIO PORTILLO and his associates utilize a number of cellular telephones to conduct their drug trafficking activities.

44. The use of a consensual monitoring device and transmitter concealed on the CW has been utilized in this investigation with limited success. To date, consensual monitoring has developed evidence concerning limited aspects of the criminal enterprise. These recording[s] demonstrate that others are involved, but fail to identify all co-conspirators or their respective roles.

45. Therefore, normal avenues of investigation appear to be unlikely to succeed in accomplishing all of the goals of this investigation. The interception of wire and electronic communications sought herein would provide the needed evidence to assemble all the necessary pieces of this cocaine distribution organization leading to the prosecution of the alleged violators.

**Second Wiretap**

**94–WT–7 (9/22/94; extended 10/21/94)**

NEED FOR INTERCEPTION:

29. As outlined in this affidavit and Attachment 1,[1] a variety of normal and routine investigative techniques have been attempted during this investigation. While some have been successful in obtaining evidence, it has become apparent that these investigative procedures will be insufficient in themselves to obtain enough evidence to properly prosecute the entire scope of this cocaine distribution network.

30. The interceptions obtained thus far pursuant to Court Order 94–WT–4, (described in paragraph 11 above) indicate that CEFERINO CASTILLO–GARCIA, who is clearly the intermediary between ROSARIO PORTILLO and the ultimate source(s) of the cocaine, is utilizing (303) 431–4345 and (303) 292–1131. On September 17, 1994, interception of conversations pursuant to Court Order 94–WT–4, (described in paragraph 11 above) were terminated. In order to further identify the ultimate supplier(s) of CEFERINO CASTILLO–GARCIA's cocaine, your affiant is seeking authorization to intercept conversations to and from (303) 431–4345 and (303) 292–1131.

31. While your affiant believes that enough evidence may exist to prosecute RO-SARIO PORTILLO–RODRIGUEZ, CEFERINO CASTILLO–GARCIA, and ISMAEL ARMENDARIZ–AMAYA on some charges, and that enough evidence may exist to obtain search warrants for PORTILLO's residence, 4500 Raritan Street, Denver, Colorado and 4331 Raritan Street, Denver, Colorado, there is no evidence to date that has been developed that would identify the person(s) who supply the cocaine to CEFERINO CASTILLO–GARCIA, the methods of delivery, the other co-conspirators who purchase the cocaine from CEFERINO CASTILLO–GARCIA, and the manner in which CEFERINO CASTILLO–GARCIA conceals profits derived from this illegal activity.

32. The Cooperating Witness number One (CW–1) has dealt directly with ROSARIO PORTILLO for over one year, purchasing in excess of 20 kilograms of cocaine. CW–1 has never been introduced to the supplier of ROSARIO PORTILLO's cocaine. CW–1 would be of no further use in investigating the other members of this drug distribution network or their activities.

33. The Cooperating Witness number Two (CW–2) has indicated a reluctance to testify in any proceeding, including before a Grand Jury or a court, concerning the criminal activity alleged herein out of fear for CW–2's personal safety and/or that of CW–2's family should CW–2's identity and cooperation be revealed. Additionally, CW–2 is in a position to furnish information of value concerning additional unrelated criminal activities. CW–2's usefulness with regard to these other matters would be jeopardized should CW–2's identity be revealed in this case.

34. a. Surveillance of ROSARIO POR-TILLO–RODRIGUEZ, CEFERINO CAS-TILLO–GARCIA, ISMAEL ARMENDAR-IZ–AMAYA and others designed to identify all of their distributors would require that their activities be monitored on a 24–hour basis. It is unlikely that such a surveillance operation could be conducted for more than a brief period of time before it was discovered, possibly placing the entire investigation in jeopardy. As noted in paragraphs 23b and

---

1. *Attachment 1 is the First Wiretap Affidavit*

24a, CEFERINO CASTILLO–GARCIA has detected surveillance on at least one occasion.

b. In your affiant's experience, surveillance of these individuals has been successful only to a limited degree, in that prior knowledge of the subjects' activities enabled surveillance officers to observe meetings at known locations.

c. In addition, surveillance, if successful, only demonstrates that two subjects met and does not reveal the nature or purpose of their meeting. Surveillance, conducted in conjunction with the interception of wire communications sought herein, may further define the purpose of such meetings.

35. Based on your affiant's experience, your affiant believes that interviews are not likely to be successful in this instance for developing sufficient evidence for the prosecution because the only persons with knowledge of the entire scope of the criminal activity are the participants themselves. To date, no witness with any knowledge of the full scope of the cocaine importation and distribution network has been identified. Interviews with persons involved in the distribution of controlled substances are not normally productive because those individuals fear reprisals by their confederates or are reluctant to cooperate because of their own culpability. Additionally, interviews and attempts to develop witnesses would serve to alert the targets of the investigation, cause them to become more cautious, and perhaps prompt them to flee the jurisdiction to avoid further investigation or possible prosecution, since many of the subjects involved in this cocaine distribution enterprise have strong ties to the Republic of Mexico.

36. The possibility of initiation of a Federal Grand Jury investigation into the illegal activities of the subjects has been discussed with attorneys assigned to the MOUNTAIN STATES DRUG TASK FORCE. Your affiant was advised that if called to testify, the subjects would likely invoke their Fifth Amendment privileges, and furthermore, that it would be unwise to seek Grand Jury immunity for any of the subjects named herein because it might foreclose prosecution of culpable individuals. In addition, witnesses called to testify before the Grand Jury cannot be prevented from notifying other members of this organization of the existence of this investigation. Such notification could result in the destruction of evidence, intimidation of witnesses, and flight by targets of the investigation to avoid prosecution.

37. Your affiant has obtained and analyzed telephone toll records, dialed number recorder (pen register) data and trap and trace information for telephones known to be available to the subjects of this investigation. This information provides only circumstantial evidence that the telephone was used. Telephone toll records, pen register and trap and trace data do not identify the individuals making or receiving wire communications, nor do they disclose the nature or purpose of those communications. Additionally, telephone toll records, pen register data and trap and trace data provide no information regarding the identity of the individuals placing the call, and are generally untimely and preclude the possibility of essential physical surveillance. Though individuals with criminal histories and controlled substance violations have been identified through this information, their specific relationship to CEFERINO CASTILLO–GARCIA and the other individuals identified herein is presently unknown.

38. Your affiant has reviewed police records of individuals suspected of being implicated in the illegal activities alleged herein. Police records reflect only that subjects have been arrested and/or convicted for their past criminal activity. These records reveal nothing concerning the details or extent of the alleged ongoing criminal activity.

39. Based upon the personal experience of the affiant and experience of investigators from the FEDERAL BUREAU OF INVESTIGATION, DENVER POLICE DEPARTMENT, IMMIGRATION and NATURALIZATION SERVICE, INTERNAL REVENUE SERVICE and BUREAU OF ALCOHOL, TOBACCO and FIREARMS, your affiant believes that the execution of search warrants would not develop sufficient evidence necessary to determine the full

scope of the alleged criminal activity, the identity of others involved in the criminal enterprise and their particular roles. There appears no reason at present to assume that these individuals maintain uncoded written information in such detail that it would completely identify the extent of and all the participants involved in their cocaine distribution organization. Although it is believed that search warrants could provide valuable information to assist in this investigation, it is doubtful that search warrants alone could lead to the identification and prosecution of all of the members of this organization. It is, however, anticipated that at a later stage in this investigation, search warrants will be requested for several locations believed to be used by the targets of this investigation for storing controlled substances.

40. Based on the information contained herein, as well as additional information provided by CW–1 and CW–2, it is apparent that CEFERINO CASTILLO–GARCIA and his associates utilize a number of telephones and cellular telephones to conduct their drug trafficking activities.

41. Therefore, normal avenues of investigation appear to be unlikely to succeed in accomplishing all of the goals of this investigation. The interception of wire communications sought herein would provide the needed evidence to assemble all the necessary pieces of this cocaine distribution organization leading to the prosecution of the alleged violators.

**Third Wiretap**

**94–WT–8 (9/22/94)**

### NEED FOR INTERCEPTION:

28. As outlined in this affidavit and Attachment 1,[2] a variety of normal and routine investigative techniques have been attempted during this investigation. While some have been successful in obtaining evidence, it has become apparent that these investigative procedures will be insufficient in themselves to obtain enough evidence to properly prosecute the entire scope of this cocaine distribution network.

29. The interceptions obtained thus far pursuant to Court Order 94–WT–4, (described in paragraphs 12, 13, 14, 15 d, 15 f, 18 c, 23, 24 a, 25, 26 a, and 26 b above) indicate that CEFERINO CASTILLO–GARCIA, who is clearly an intermediary between ROSARIO PORTILLO and other source(s) of cocaine and marijuana, is utilizing the digital display paging device assigned telephone number (303) 251–1594 (subject of this request for interception). Interception of calls to the digital display paging device assigned telephone number (303) 251–1594, would allow your affiant to identify the source(s) of the cocaine.

30. Additionally, interceptions obtained thus far pursuant to Court Order 94–WT–4, (described in paragraphs 15 a, 15 b, 15 c, 15 e, 19, 24 c, 26 c, and 26 d above) indicates that JAIME OLIVAS–SANCHEZ, is the intermediary between ROSARIO PORTILLO and other source(s) of cocaine and marijuana, are utilizing the digital display paging device assigned telephone number (303) 609–1931 (subject of this request for interception). Interception of calls to the digital display paging device assigned telephone number (303) 609–1931, would allow your affiant to identify the source(s) of the cocaine and marijuana.

31. While your affiant believes that enough evidence may exist to prosecute ROSARIO PORTILLO–RODRIGUEZ, CEFERINO CASTILLO–GARCIA, ISMAEL ARMENDARIZ–AMAYA, GUERREROS SANCHEZ–OLIVAS, and JAIME OLIVAS–SANCHEZ on some charges, and that enough evidence may exist to obtain search warrants for PORTILLO's residence, 4500 Raritan Street, Denver, Colorado and 4331 Raritan Street, Denver, Colorado, there is no evidence to date that has been developed that would identify the person(s) who supply the cocaine and marijuana to CEFERINO CASTILLO–GARCIA, ISMAEL ARMENDARIZ–AMAYA, GUERREROS SANCHEZ–OLIVAS, and JAIME OLIVAS–SANCHEZ, the methods of delivery, the other co-conspirators who purchase the cocaine and marijuana from CEFERINO CASTILLO–GARCIA, ISMAEL ARMENDARIZ–AMAYA, GUERREROS SANCHEZ–OLI-

2. *There is no "Attachment 1" to the Third Wiretap Affidavit.*

VAS, and JAIME OLIVAS–SANCHEZ, and the manner in which CEFERINO CASTILLO–GARCIA, ISMAEL ARMENDARIZ–AMAYA, GUERREROS SANCHEZ–OLIVAS, and JAIME OLIVAS–SANCHEZ conceal profits derived from this illegal activity.

32. The Cooperating Witness Number One (CW–1) has dealt directly with ROSARIO PORTILLO for over one year, purchasing in excess of 20 kilograms of cocaine. CW–1 has never been introduced to the supplier of ROSARIO PORTILLO's cocaine. CW–1 would be of no further use in investigating the other members of this drug distribution network or their activities.

33. The Confidential Source (CS–1) has indicated a reluctance to testify in any proceeding, including before a Grand Jury or a court. concerning the criminal activity alleged herein out of fear for CS–1's personal safety and/or that of CS–1's family should CS–1's identity and cooperation be revealed. Additionally, CS–1 is in a position to furnish information of value concerning additional unrelated criminal activities. CS–1's usefulness with regard to these other matters would be jeopardized should CS–1's identity be revealed in this case.

34. a. Surveillance of ROSARIO PROTILLO–RODRIGUEZ, CEFERINO CASTILLO–GARCIA, ISMAEL ARMENDARIZ–AMAYA, GUERREROS SANCHEZ–OLIVAS, JAIME OLIVAS–SANCHEZ, and others designed to identify all of their distributors would require that their activities be monitored on a 24–hour basis. It is unlikely that such a surveillance operation could be conducted for more than a brief period of time before it was discovered, possibly placing the entire investigation in jeopardy. As noted in paragraphs 23 a and 24 a, CEFERINO CASTILLO–GARCIA has detected surveillance on at least one occasion.

b. In your affiant's experience, surveillance of these individuals has been successful only to a limited degree, in that prior knowledge of the subjects' activities enabled surveillance officers to observe meetings at known locations.

35. Based on your affiant's experience, your affiant believes that interviews are not likely to be successful in this instance for developing sufficient evidence for the prosecution because the only persons with knowledge of the entire scope of the criminal activity are the participants themselves. To date, no witness with any knowledge of the full scope of the cocaine importation and distribution network has been identified. Interviews with persons involved in the distribution of controlled substances are not normally productive because those individuals fear reprisals by their confederates or are reluctant to cooperate because of their own culpability. Additionally, interviews and attempts to develop witnesses would serve to alert the targets of the investigation, cause them to become more cautious, and perhaps prompt them to flee the jurisdiction to avoid further investigation or possible prosecution, since many of the subjects involved in this cocaine distribution enterprise have strong ties to the Republic of Mexico.

36. The possibility of initiation of a Federal Grand Jury investigation into the illegal activities of the subjects has been discussed with attorneys assigned to the MOUNTAIN STATES DRUG TASK FORCE. Your affiant was advised that if called to testify, the subjects would likely invoke their Fifth Amendment privileges, and furthermore, that it would be unwise to seek Grand Jury immunity for any of the subjects named herein because it might foreclose prosecution of culpable individuals. In addition, witnesses called to testify before the Grand Jury cannot be prevented from notifying other members of this organization of the existence of this investigation. Such notification could result in the destruction of evidence, intimidation of witnesses, and flight by targets of the investigation to avoid prosecution.

37. Your affiant has obtained and analyzed telephone toll records, dialed number recorder (pen register) data and trap and trace information for telephones known to be available to the subjects of this investigation. This information provides only circumstantial evidence that the telephone was used. Telephone toll records, pen register and trap and trace data do not identify the individuals

making or receiving electronic communications, nor do they disclose the nature or purpose of those communications. Additionally, telephone toll records, pen register data and trap and trace data provide no information regarding the identity of the individuals placing the call, and are generally untimely and preclude the possibility of essential physical surveillance. Though individuals with criminal histories and controlled substance violations have been identified through this information, their specific relationship to CEFERINO CASTILLO–GARCIA, ISMAEL ARMENDARIZ–AMAYA, ROSARIO PORTILLO–RODRIGUEZ, GUERREROS SANCHEZ–OLIVAS, and JAIME OLIVAS–SANCHEZ is presently unknown.

38. Your affiant has reviewed police records of individuals suspected of being implicated in the illegal activities alleged herein. Police records reflect only that subjects have been arrested and/or convicted for their past criminal activity. These records reveal nothing concerning the details or extent of the alleged ongoing criminal activity.

39. Based upon the personal experience of the affiant and experience of investigators from the FEDERAL BUREAU OF INVESTIGATION, DENVER POLICE DEPARTMENT, IMMIGRATION and NATURALIZATION SERVICE, INTERNAL REVENUE SERVICE and BUREAU OF ALCOHOL, TOBACCO and FIREARMS, your affiant believes that the execution of search warrants would not develop sufficient evidence necessary to determine the full scope of the alleged criminal activity, the identity of others involved in the criminal enterprise and their particular roles. There appears no reason at present to assume that these individuals maintain uncoded written information in such detail that it would completely identify the extent of and all the participants involved in their cocaine distribution organization. Although it is believed that search warrants could provide valuable information to assist in this investigation, it is doubtful that search warrants alone could lead to the identification and prosecution of all of the members of this organization. It is, however, anticipated that at a later stage in this investigation, search warrants will be requested for several locations believed to be used by the targets of this investigation for storing controlled substances.

40. Therefore, normal avenues of investigation appear to be unlikely to succeed in accomplishing all of the goals of this investigation. The interception of electronic communications sought herein would provide the needed evidence to assemble all the necessary pieces of this cocaine distribution organization leading to the prosecution of the alleged violators.

**Fourth Wiretap**

**94–WT–10 (10/7/94)**

NEED FOR INTERCEPTION:

37. As outlined in this affidavit, Attachment 1,[3] and Attachment 2,[4] a variety of normal and routine investigative techniques have been attempted during this investigation. While some have been successful in obtaining evidence, it has become apparent that these investigative procedures will be insufficient in themselves to obtain enough evidence to properly prosecute the entire scope of this cocaine and marijuana distribution network.

38. The interceptions obtained pursuant to Court Order 94–WT–4, (described in paragraph 11 above) indicated that CEFERINO CASTILLO–GARCIA, who is clearly the intermediary between ROSARIO PORTILLO and the ultimate source(s) of the cocaine and marijuana, is utilizing (303) 477–2721 (target telephone number). On September 17, 1994, interception of conversations pursuant to Court Order 94–WT–4, (described in paragraph 11 above) were terminated. Additional interceptions obtained pursuant to Court Order 94–WT–7, (described in paragraph 29 a above) indicate that other individuals are involved in the distribution of cocaine and marijuana with CEFERINO CASTILLO–GARCIA in the Denver, Colorado area. Two of these individuals, ISMAEL ARMENDAR-

---

3. *Attachment 1 is the Second Wiretap Affidavit.*

4. *There is no "Attachment 2." Instead, a second "Attachment 1," consisting of the First Wiretap Affidavit, is attached.*

IZ–AMAYA and FIDELA ARMENDARIZ, have moved from 6550 Benton Street, Arvada, Colorado, to the residence of CEFERINO CASTILLO–GARCIA, 3739 Inca Street, Denver, Colorado. In order to further identify the ultimate supplier(s) of CEFERINO CASTILLO–GARCIA's cocaine and marijuana, your affiant is seeking authorization to intercept conversations to and from (303) 477–2721.

39. While your affiant believes that enough evidence may exist to prosecute ROSARIO PORTILLO–RODRIGUEZ, CEFERINO CASTILLO–GARCIA, ISMAEL ARMENDARIZ–AMAYA, FIDELA ARMENDARIZ, and JEFFERY SAMUEL PINO on some charges, and that enough evidence may exist to obtain search warrants for PORTILLO's residence, 4500 Raritan Street, Denver, Colorado and 4331 Raritan Street, Denver, Colorado, there is no evidence to date that has been developed that would identify the person(s) who supply the cocaine and marijuana to CEFERINO CASTILLO–GARCIA, the methods of delivery, the other co-conspirators who purchase the cocaine from CEFERINO CASTILLO–GARCIA, and the manner in which CEFERINO CASTILLO–GARCIA conceals profits derived from this illegal activity.

40. Cooperating Witness One (CW–1) has dealt directly with ROSARIO PORTILLO for over one year, purchasing in excess of 20 kilograms of cocaine. CW–1 has never been introduced to the supplier of ROSARIO PORTILLO's cocaine. CW–1 would be of no further use in investigating the other members of this drug distribution network or their activities.

41. Cooperating Witness Two (CW–2) has indicated a reluctance to testify in any proceeding, including before a Grand Jury or a court, concerning the criminal activity alleged herein out of fear for CW–2's personal safety and/or that of CW–2's family should CW–2's identity and cooperation be revealed. Additionally, CW–2 is in a position to furnish information of value concerning additional unrelated criminal activities. CW–2's usefulness with regard to these other matters would be jeopardized should CW–2's identity be revealed in this case.

42. a. Surveillance of ROSARIO PORTILLO–RODRIGUEZ, CEFERINO CASTILLO–GARCIA, ISMAEL ARMENDARIZ–AMAYA, FIDELA ARMENDARIZ, JEFFERY SAMUEL PINO, and others designed to identify all of their distributors would require that their activities be monitored on a 24-hour basis. It is unlikely that such a surveillance operation could be conducted for more than a brief period of time before it was discovered, possibly placing the entire investigation in jeopardy. As noted in paragraphs 24 d and 25, CEFERINO CASTILLO–GARCIA has detected surveillance on at least one occasion.

b. In your affiant's experience, surveillance of these individuals has been successful only to a limited degree, in that prior knowledge of the subjects' activities enabled surveillance officers to observe meetings at known locations.

c. In addition, surveillance, if successful, only demonstrates that two subjects met and does not reveal the nature or purpose of their meeting. Surveillance, conducted in conjunction with the interception of wire communications sought herein, may further define the purpose of such meetings.

43. Based on your affiant's experience, your affiant believes that interviews are not likely to be successful in this instance for developing sufficient evidence for the prosecution because the only persons with knowledge of the entire scope of the criminal activity are the participants themselves. To date, no witness with any knowledge of the full scope of the cocaine and marijuana importation and distribution network has been identified. Interviews with persons involved in the distribution of controlled substances are not normally productive because those individuals fear reprisals by their confederates or are reluctant to cooperate because of their own culpability. Additionally, interviews and attempts to develop witnesses would serve to alert the targets of the investigation, cause them to become more cautious, and perhaps prompt them to flee the jurisdiction to avoid further investigation or possible prosecution, since many of the subjects involved in this

cocaine and marijuana distribution enterprise have strong ties to the Republic of Mexico.

44. The possibility of initiation of a Federal Grand Jury investigation into the illegal activities of the subjects has been discussed with attorneys assigned to the MOUNTAIN STATES DRUG TASK FORCE. Your affiant was advised that if called to testify, the subjects would likely invoke their Fifth Amendment privileges, and furthermore, that it would be unwise to seek Grand Jury immunity for any of the subjects named herein because it might foreclose prosecution of culpable individuals. In addition, witnesses called to testify before the Grand Jury cannot be prevented from notifying other members of this organization of the existence of this investigation. Such notification could result in the destruction of evidence, intimidation of witnesses, and flight by targets of the investigation to avoid prosecution.

45. Your affiant has obtained and analyzed telephone toll records, dialed number recorder (pen register) data and trap and trace information for telephones known to be available to the subjects of this investigation. This information provides only circumstantial evidence that the telephone was used. Telephone toll records, pen register and trap and trace data do not identify the individuals making or receiving wire communications, nor do they disclose the nature or purpose of those communications. Additionally, telephone toll records, pen register data and trap and trace data provide no information regarding the identity of the individuals placing the call, and are generally untimely and preclude the possibility of essential physical surveillance. Though individuals with criminal histories and controlled substance violations have been identified through this information, their specific relationship to CEFERINO CASTILLO–GARCIA and the other individuals identified herein is presently unknown.

46. The electronic interception of the digital display pager (251–1594) utilized by an unknown associate of CEFERINO CASTILLO–GARCIA has been helpful in obtaining the identities of some of the possible co-conspirators, but in itself is insufficient to properly determine the significance of its use.

47. Your affiant has reviewed police records of individuals suspected of being implicated in the illegal activities alleged herein. Police records reflect only that subjects have been arrested and/or convicted for their past criminal activity. These records reveal nothing concerning the details or extent of the alleged ongoing criminal activity.

48. Based upon the personal experience of the affiant and experience of investigators from the FEDERAL BUREAU OF INVESTIGATION, DENVER POLICE DEPARTMENT, IMMIGRATION and NATURALIZATION SERVICE, INTERNAL REVENUE SERVICE and BUREAU OF ALCOHOL, TOBACCO and FIREARMS, your affiant believes that the execution of search warrants would not develop sufficient evidence necessary to determine the full scope of the alleged criminal activity, the identity of others involved in the criminal enterprise and their particular roles. There appears no reason at present to assume that these individuals maintain uncoded written information in such detail that it would completely identify the extent of and all the participants involved in their cocaine and marijuana distribution organization. Although it is believed that search warrants could provide valuable information to assist in this investigation, it is doubtful that search warrants alone could lead to the identification and prosecution of all of the members of this organization. It is, however, anticipated that at a later stage in this investigation, search warrants will be requested for several locations believed to be used by the targets of this investigation for storing controlled substances.

**Fifth Wiretap**

**94–WT–11 (10/21/94)**

NEED FOR INTERCEPTION:

30. As outlined in this affidavit, Attachment 1,[5] and Attachment 2,[6] a variety of normal and routine investigative techniques

---

5. *Attachment 1 is the First Wiretap Affidavit.*

6. *Attachment 2 is the Third Wiretap Affidavit.*

have been attempted during this investigation. While some have been successful in obtaining evidence, it has become apparent that these investigative procedures will be insufficient in themselves to obtain enough evidence to properly prosecute the entire scope of this cocaine distribution network.

31. The interceptions obtained pursuant to Court Order 94–WT–4, (described in paragraph 13 above), and thus far pursuant to Court Order 94–WT–8, (described in paragraph 25) indicate that JAIME OLIVAS–SANCHEZ, who is clearly an intermediary between ROSARIO PORTILLO and the source(s) of the cocaine and marijuana, is utilizing (303) 937–1365. On September 17, 1994, interception of conversations pursuant to Court Order 94–WT–4, (described in paragraph 13 above) were terminated. In order to further identify the ultimate supplier(s) of JAIME OLIVAS–SANCHEZ' cocaine and marijuana, your affiant is seeking authorization to intercept conversations to and from (303) 937–1365.

32. While your affiant believes that enough evidence may exist to prosecute ROSARIO PORTILLO–RODRIGUEZ and JAIME OLIVAS–SANCHEZ on some charges, and that enough evidence may exist to obtain search warrants for JAIME OLIVAS–SANCHEZ' residence, 3185 West Alaska Place, Denver, Colorado, there is no evidence to date that has been developed that would identify the person(s) who supply the cocaine and marijuana to JAIME OLIVAS–SANCHEZ, the methods of delivery, the other co-conspirators who purchase the cocaine and marijuana from JAIME OLIVAS–SANCHEZ, and the manner in which JAIME OLIVAS–SANCHEZ conceals profits derived from this illegal activity.

33. The Cooperating Witness number One (CW–1) has dealt directly with ROSARIO PORTILLO for over one year, purchasing in excess of 20 kilograms of cocaine. CW–1 has never been introduced to the supplier of ROSARIO PORTILLO's cocaine. CW–1 would be of no further use in investigating the other members of this drug distribution network or their activities.

34. a. Surveillance of ROSARIO POR-TILLO–RODRIGUEZ, JAIME OLIVAS–SANCHEZ, GUERREROS SANCHEZ–OLIVAS and others designed to identify all of their distributors would require that their activities be monitored on a 24-hour basis. It is unlikely that such a surveillance operation could be conducted for more than a brief period of time before it was discovered, possibly placing the entire investigation in jeopardy.

b. In your affiant's experience, surveillance of these individuals has been successful only to a limited degree, in that prior knowledge of the subjects' activities enabled surveillance officers to observe meetings at known locations.

c. In addition, surveillance, if successful, only demonstrates that two subjects met and does not reveal the nature or purpose of their meeting. Surveillance, conducted in conjunction with the interception of wire communications sought herein, may further define the purpose of such meetings.

35. Based on your affiant's experience, your affiant believes that interviews are not likely to be successful in this instance for developing sufficient evidence for the prosecution because the only persons with knowledge of the entire scope of the criminal activity are the participants themselves. To date, no witness with any knowledge of the full scope of the cocaine importation and distribution network has been identified. Interviews with persons involved in the distribution of controlled substances are not normally productive because those individuals fear reprisals by their confederates or are reluctant to cooperate because of their own culpability. Additionally, interviews and attempts to develop witnesses would serve to alert the targets of the investigation, cause them to become more cautious, and perhaps prompt them to flee the jurisdiction to avoid further investigation or possible prosecution, since many of the subjects involved in this cocaine and marijuana distribution enterprise have strong ties to the Republic of Mexico.

36. The possibility of initiation of a Federal Grand Jury investigation into the illegal activities of the subjects has been discussed with attorneys assigned to the MOUNTAIN

STATES DRUG TASK FORCE. Your affiant was advised that if called to testify, the subjects would likely invoke their Fifth Amendment privileges, and furthermore, that it would be unwise to seek Grand Jury immunity for any of the subjects named herein because it might foreclose prosecution of culpable individuals. In addition, witnesses called to testify before the Grand Jury cannot be prevented from notifying other members of this organization of the existence of this investigation. Such notification could result in the destruction of evidence, intimidation of witnesses, and flight by targets of the investigation to avoid prosecution.

37. Your affiant has obtained and analyzed telephone toll records, dialed number recorder (pen register) data, trap and trace information for telephones and pagers known to be available to the subjects of this investigation. This information provides only circumstantial evidence that the telephone was used. Telephone toll records, pen register and trap and trace data do not identify the individuals making or receiving wire communications, nor do they disclose the nature or purpose of those communications. Additionally, telephone toll records, pen register data and trap and trace data provide no information regarding the identity of the individuals placing the call, and are generally untimely and preclude the possibility of essential physical surveillance. Though individuals with criminal histories and controlled substance violations have been identified through this information, their specific relationship to JAIME OLIVAS–SANCHEZ and the other individuals identified herein is presently unknown.

38. Your affiant has reviewed police records of individuals suspected of being implicated in the illegal activities alleged herein. Police records reflect only that subjects have been arrested and/or convicted for their past criminal activity. These records reveal nothing concerning the details or extent of the alleged ongoing criminal activity.

39. Based upon the personal experience of the affiant and experience of investigators from the FEDERAL BUREAU OF INVESTIGATION, DENVER POLICE DEPARTMENT, DRUG ENFORCEMENT ADMINISTRATION, IMMIGRATION and NATURALIZATION SERVICE, INTERNAL REVENUE SERVICE and BUREAU OF ALCOHOL, TOBACCO and FIREARMS, your affiant believes that the execution of search warrants would not develop sufficient evidence necessary to determine the full scope of the alleged criminal activity, the identity of others involved in the criminal enterprise and their particular roles. There appears no reason at present to assume that these individuals maintain uncoded written information in such detail that it would completely identify the extent of and all the participants involved in their cocaine distribution organization. Although it is believed that search warrants could provide valuable information to assist in this investigation, it is doubtful that search warrants alone could lead to the identification and prosecution of all of the members of this organization. It is, however, anticipated that at a later stage in this investigation, search warrants will be requested for several locations believed to be used by the targets of this investigation for storing controlled substances.

40. Based on the information contained herein, it is apparent that JAIME OLIVAS–SANCHEZ and his associates utilize a number of telephones, cellular telephones, and digital display paging devices to conduct their drug trafficking activities.

41. Therefore, normal avenues of investigation appear to be unlikely to succeed in accomplishing all of the goals of this investigation. The interception of wire communications sought herein would provide the needed evidence to assemble all the necessary pieces of this cocaine and marijuana distribution organization leading to the prosecution of the alleged violators.